John W. WILSON, Appellee,

v.

VOLKSWAGEN OF AMERICA, INC., a New York Corporation and Volkswagenwerk, A. G., a Foreign Corporation, Wolfsburg, Western Germany, Appellants.

No. 76–1883.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 16, 1977.

Decided Aug. 15, 1977.

496

John S. Battle, Jr., Richmond, Va. (John M. Oakey, Jr., Alexander H. Slaughter, William H. Robinson, Jr., McQuire, Woods & Battle, Richmond, Va., on brief), for appellants.

Henry H. Wallace, Pittsburgh, Pa. (William Peter Chapas, Russell J. Ober, Jr., Wallace, Chapas & Ober, Pittsburgh, Pa., Stuart W. Settle, Richmond, Va., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and BUTZNER and RUSSELL, Circuit Judges.

DONALD RUSSELL, Circuit Judge.

This is a products liability case. On the eve of its trial, default judgment on liability was ordered by the District Court

against the defendants-manufacturers under Rule 37(b), Fed.R.Civ.P., 28 U.S.C., on the basis of a finding of failure to comply with an oral order in discovery.[1] The District Court thereafter submitted the single issue of damages to a jury, and judgment was entered on the jury verdict. The defendants have appealed, charging error only in the grant of default judgment on liability.

We reverse.

I

The action arose out of an automobile accident in which the plaintiff concededly received serious permanent injuries. At the time the plaintiff was driving a Volkswagen Beetle[2] owned by his companion, Miss Wobbeking. The car was about a year old and had been driven approximately 17,-000 miles. It had been previously involved in another accident in September of the year before, as a result of which it had received considerable damage to the front end. The accident, which is the subject of this action, occurred at about 6:30 on the morning of April 1, 1973. The plaintiff and Miss Wobbeking, both of whom were living at the time in Washington, had met at about 8 o'clock on the preceding evening of March 31st in Washington and had then gone in the Beetle to a party at the home of a friend in the environs of Washington. They remained at this party until about midnight. While there, the plaintiff testified by deposition that he drank two glasses of wine. Miss Wobbeking, who had taken a bottle of wine with her in the car, apparently drank sufficient at the party, according to her own deposition testimony, to be tipsy.

The plaintiff and Miss Wobbeking proceeded directly from this party to the home of James Brown in Occoquan, and visited there until 3 or 4 o'clock on the morning of April 1. The plaintiff testified in his deposition that, while wine was available at this party, he did not drink any. When they left the Brown home, the plaintiff and Miss Wobbeking intended to return to Washington by way of Interstate Highway 95. However, the plaintiff, as he drove onto Interstate 95, turned south toward Richmond instead of north toward Washington. It was not until he had passed Fredericksburg, Virginia, and was near Richmond, Virginia, that he discovered his mistake. He then turned back toward Washington and it was on this return trip at a point about seven-tenths of a mile north of Route 3, in the northbound lane, approximately one mile west of Fredericksburg that the accident occurred.

The circumstances of the accident were detailed by the plaintiff in his deposition given in the early months of the litigation. He described the night of the accident as "lousy," marked by heavy rains and strong and gusty winds. During the night he said he had experienced no difficulty in the operation of the car, other than that occasioned by the strong winds. In fact, he described the vehicle's performance: "[E]xcept for the wind factor, it was fine." His account of the accident itself was:

" * * * Driving along, I passed a car, pulled back into the right-hand lane. The car was being kind of buffeted about by the wind, you know, Volkswagens, if you have ever driven them, they can be pushed sideways.

---

**1.** There was some discussion whether the grant of default was under Rule 37(b) or Rule 37(d). It was argued that for default to be granted under 37(b) there must be a prior formal order to comply. There was none in this case, though at a hearing the Court had indicated orally what should be produced. The defendants contended in the District Court that when a drastic remedy such as default judgment is being employed, there must be strict compliance with the Rule and that means a specific order in writing under Rule 37(b). If, on the other hand, the grant was under 37(d), it was contended that notice of the motion must be given and local rules require any motion to be in writing. There was no compliance with these requirements. *See, Securities & Exch. Com'mn. v. Research Automation Corp.* (2d Cir. 1975) 521 F.2d 585, 588-9. Apparently, the defendants seem not to have rested their appeal on these technical arguments and we do not accordingly consider them.

**2.** Miss Wobbeking was sleeping at the time and was unable to give any account of the accident itself.

498

"Driving along and hit by the especially strong gust of wind on the driver's side, I lost control, went off the road and rolled over."

The plaintiff estimated his speed as he passed the car at between 50 and 60 miles an hour. The occupants of the car passed, however, told the officers who investigated the accident immediately after it occurred that their car was traveling at a speed of about 70 miles an hour when they were passed by the plaintiff.[3]

Within twenty-four hours after the accident, Robert K. Stitt, III, an attorney in Pittsburgh, Pennsylvania, was employed on plaintiff's behalf, by the latter's brother. This attorney began an immediate investigation of the accident. He took possession of the car itself, had it moved to Pittsburgh, and kept it under his control in an open garage for more than two years. Within a week he had interviewed one of the state troopers who had investigated the accident and knew the version of the accident as given by the occupants of the car which was passed by the plaintiff just before the accident.[3a] It was not, however, until some eight months after the accident that Stitt first notified the defendants, the manufacturer and the distributor of the car, of the accident, or made any claim against them on behalf of the plaintiff. When he did communicate with the defendants, Mr. Stitt gave the defendants no details of the accident. This is obvious from the defendants' reply to Mr. Stitt's letter. In this reply the defendants wrote that "this is the first indication we have of any difficulty which your client, John Wilson, may have experienced on April 1, 1973, we would appreciate any and all facts, reports, records, photographs, etc., which you may have to substantiate his claim so that we may be given the opportunity to evaluate it and discuss future handling with you." Stitt did not reply to this letter. Actually the defendants received no further communication about plaintiff's claim from Mr. Stitt or from anyone else until March 28, 1975, when this action against the defendants was filed, two days before the time when the claim would have been barred. In the meantime, Mr. Stitt had been convicted of "insurance fraud" and had been suspended from the practice of law. His brother, who seemingly had taken his affairs over, then transferred this case to other counsel for the plaintiff, one of whom is counsel prosecuting this action on plaintiff's behalf.

In his complaint, the plaintiff alleged merely that "a defect in the design, manufacture and assembly" of the vehicle, manufactured and marketed by the defendants, caused it "to become unstable, go out of control, strike a guard rail * * * roll over and injure" plaintiff. He made no effort to identify in his complaint the car's specific defect which, under his theory of the action, was responsible for the accident. He sought recovery both under strict liability and breach of warranty. The defendants answered the complaint, denying liability on a number of grounds. After the defendants answered the complaint, the plaintiff

3. The investigating officer summarized the statements of the occupants of the car passed by the plaintiff in his deposition as follows:
"* * * they (i. e., the occupants in the passed car) were traveling the speed limit, or a little above, which at that time was 70 miles an hour; and they said the Volkswagen came by them at a high rate of speed, in the passing lane, and just cut straight across in front of them and struck the guardrail and then rolled to the position where it was when I arrived."
There is in the answer to interrogatories filed by the plaintiff statements in the investigating officer's report of the accident to which plaintiff took exception as inaccurate. Among these were:

(a) The officer's estimate of the plaintiff's speed at time of accident at 80 miles an hour;
(b) The plaintiff was drinking but officer "did not know whether his driving ability was impaired;"
(c) The plaintiff was guilty of reckless driving.

3a. The trooper testified to an interview by some one representing the plaintiff but he did not recall the name of the interviewer. Stitt, in his deposition, identified himself as the interviewer. The report of the trooper was later made available by counsel for the plaintiff to plaintiff's expert witness Joseph Harris, who refers to it in his letter to counsel on October 4, 1975.

filed a Notice to Produce, addressed to the defendants. The defendants directed Interrogatories to the plaintiff. In their Interrogatories, the defendants sought to ascertain from the plaintiff, among other things, the basis of his claim, or, as they phrased it, "the relevant area of inquiry," by which they meant the specific defect in the car on which the plaintiff relied. The defendants filed on May 30, 1975, formal objections to the plaintiff's Notice to Produce. The defendants concluded their objections with this statement:

"As required by Local Rule of Court 11(N) counsel have met in a bonafide effort to resolve the objections raised. Defense counsel have asked plaintiffs' counsel to define the relevant areas of inquiry, and have agreed to respond to the Motion to Produce when the relevant areas have been ascertained."

The plaintiff, on the other hand, neither answered nor filed any objections to the defendants' Interrogatories, which had been filed on June 6, 1975 and June 23, 1975; he simply ignored them.

It is stated in the record by defendants' counsel and not disputed by the plaintiff, that the defendants several times importuned the plaintiff to answer their Interrogatories, to which he had filed no objections. The defendants, it is claimed by the defendants, were promised without avail answers by the plaintiff over a period of almost four months. Whatever the circumstances, the plaintiff ignored the Interrogatories filed by the defendants for almost four months. In the meantime, the District Court had ordered all discovery completed by November 15, 1975, in anticipation of trial on January 12, 1976. Concerned that the persistent delay of the plaintiff in answering their Interrogatories might preclude any meaningful discovery on their part within the timetable fixed by the Court, since they did not know the exact

defect or defects on which the plaintiff relied, or the names of any expert witnesses on whom he might rely, to prove the claimed defect or defects, the defendants moved on August 25, 1975, and September 23, 1975, for an order compelling answers by the plaintiff to their Interrogatories. These motions resulted in an order of the Court dated September 23, 1975, requiring the plaintiff to answer the defendants' Interrogatories within six days. The plaintiff ignored this order of the Court as he had earlier ignored the Interrogatories addressed to him. In this posture of the discovery proceedings, the defendants moved for dismissal. After a hearing the District Court entered a second order commanding the plaintiff to answer the Interrogatories of the defendants on or before October 20, 1975. Finally, on October 20, 1975, in compliance with this second order to answer, the plaintiff filed sworn answers to the defendants Interrogatories.[4]

In the meantime, the plaintiff, for his part, had filed on October 10, 1975, a Motion for Order for Production of Documents by the defendants under his Notice previously filed.[5] As noted, the plaintiff had been in long default in answering the defendants' Interrogatories and had ignored, without offering any excuse, the Court's order of September 23 requiring him to answer defendants' Interrogatories. He, also, ignored the statement of the defendants in their objections to his original Notice to Produce as filed on May 30, 1975, that whenever the plaintiff would, in answer to their Interrogatories, indicate the "relevant areas of inquiry," to plaintiff's claims, they would produce the appropriate documents and material. Understandably, the Court under these circumstances, refused the Motions to Produce, filed by the plaintiff on October 21, 1975, and October 28, 1975, respectively.[6] At an unreported

---

**4.** The plaintiff did file answers earlier on October 8 and 10, 1975, but these were unsworn. The defendants would not accept them.

**5.** On October 15, 1975, the plaintiff filed an Amended Motion to Produce, narrowing some-

what the requests in the original Motion to Produce.

**6.** The plaintiff, in his brief, refers to a "status conference of October 15, 1975," during which the Court entered a "Discovery Order." There

pre-trial conference on November 4, 1975, the Court considered the defendants' objections to the Amended Motion to Produce and orally directed the defendants, apparently in conformity with "agreement of counsel in chambers," to make discovery "largely limited to * * * evidence having to do with variously roof intrusion and flexible coupling tests." [7]

It was only with the belated filing of plaintiff's answers to the defendants' Interrogatories that the defendants were advised for the first time of the specific nature of plaintiff's claim, the alleged defects in the car on which he relied, the expert witness he intended at that time to use,[8] the persons who, since the accident, had had possession of the car, and the names of the persons who had examined the car in an effort to determine what, if any, defects there might be in the car.

After receiving plaintiff's answers, the defendants proceeded promptly with further discovery. They deposed Harris, who was the only expert witness listed by the plaintiff. They attempted to depose Stitt, who had had possession of the car from the time of the accident up to six months after suit was filed. They had issued a subpoena for him and turned it over to the marshal's office in Pittsburgh for service. The marshal had learned, however, that Stitt had moved from his former address, but had experienced difficulty in ascertaining where he had moved. The defendants sought assistance from counsel for the plaintiff but the latter replied that the location of Stitt

was "the prerogative of Defendant's counsel." [9] In any event the defendants were unable to locate or serve Stitt before the time fixed for discovery had expired. Moreover, three days before discovery was to be completed, plaintiff orally advised the defendants he expected to use two additional expert witnesses. Faced with this situation, the defendants promptly moved to extend discovery. The plaintiff opposed the motion.

A hearing on the motion to extend discovery was held on November 25, 1975. The defendants argued that they had been delayed and prejudiced in their ability to proceed with discovery by the unwarranted delay by the plaintiff in answering their Interrogatories and in providing them with any specific information on plaintiff's claim and the names of witnesses he expected to use to prove his claim. By way of reply, the plaintiff sought to excuse his failure to answer defendants' Interrogatories within time and his ignoring of the Court's order to answer. He justified such failure on the ground that until he received the report of his expert Joseph Harris in October, 1975, he did not know of any defect in the car and could not answer the Interrogatories— or presumably oppose defendants' motion to dismiss. In offering this excuse, he also conceded that until October 20, 1975, the defendants were ignorant of plaintiff's specific claim of defect, or the "area of inquiry" to which the Interrogatories and Notice to Produce were relevant.

is, so far as we can ascertain, no such "Discovery Order" in the record and it would seem that the issuance of any such "Order" would be inconsistent with the Court's orders of October 21 and October 28, denying and refusing the plaintiff's Motion and Amended Motion for such an "Order."

**7.** During the deposition of Jurgen Heise, taken on February 11, 1976, counsel for the plaintiff confirmed this understanding of the Court's ruling saying:

"Roof and steering, that's really what we're all limited to."

**8.** In these answers, the plaintiff stated he intended to use a single expert witness, Joseph Harris.

**9.** It is obvious that plaintiff's counsel had no desire to aid the defendants in effecting service on Stitt. In answer to defendants' Interrogatories, the plaintiff had stated that Stitt had the car as late as September 4, 1975, when plaintiff or his counsel took possession. It is obvious from this that in September, 1975, the plaintiff or his counsel knew Stitt's whereabouts.

The Court viewed with some disbelief the failure of plaintiff or his counsel to cooperate with the defendants in locating Stitt. At the hearing on the motion to extend discovery, it said: "I don't know whether the plaintiff, through his counsel, knows where Mr. Stitt is or has been, but apparently there is a relationship at least through the brother with your firm."

It is of interest, particularly in the light of subsequent developments in the case, that when the plaintiff offered this excuse for his default in answering defendants' Interrogatories and for delay in identifying the claim of car defect on which he grounded his cause of action, the Court expressed its amazement at the action of the plaintiff "of coming into court and asking for an adjudication of plaintiff's rights when plaintiff himself doesn't even know why he is in court." It made it clear that "the biggest problem" it had had with the case arose out of the fact that until "sometime in October" the plaintiff said that he "had no idea what defect did cause the accident." It absolved the defendants of any responsibility for delay, observing, "I don't see how defendants can be expected to have prepared a defense when the plaintiff had not even prepared an offense until last month." It added significantly that "the genesis of the discovery problems in this case lies with the failure of plaintiff to come forward until last month to disclose what his case was [about]," restating what the plaintiff had already conceded, i. e., that "[t]he reason for plaintiff's not answering it [the defendants' Interrogatories] and saying what his case was all about was * * * that plaintiff did not know." [10]

Initially, the Court ruled that the defendants would be given additional time to serve and depose Stitt but refused to reopen discovery to enable the defendants to depose the two new expert witnesses of the plaintiff, ruling instead that the plaintiff would not be permitted to use such witnesses at trial. Upon motion of the plaintiff for reconsideration, the Court, however, reopened discovery.

A final pre-trial hearing was held by the Court on March 26, 1976. The hearing was not reported. It is agreed, however, that at this hearing, counsel for the plaintiff raised with the District Court for the first time what he considered the failure of the defendants to comply fully with his Amended Motion to Produce, as reviewed by the Court at the earlier hearing in November. He went on to identify the items he claimed had not been produced by the defendants by reading a letter dated March 15, which he had addressed to counsel for the defendants and the reply of defendants' counsel to that letter. In his letter plaintiff's counsel identified the information which he claimed the defendants had not produced as "[m]ovies and written reports and information concerning dynamic rollover tests on Volkswagen Beetles, 1966, through 1973" but not "drop tests and sled tests, movies" which had been produced, "[a]ll design and/or engineering guides for body structure and design of 1972 Beetle support posts and roof," and information requested in paragraphs 6, 10, 13, 18 and 23 of plaintiff's amended motion to produce.[10a] To this letter of the plaintiff, counsel for the defendants replied that all rollover tests which were then available had been produced. Counsel stated that there were "other tests done in the initial stages of the design

---

**10.** The Court concluded this hearing on November 25, 1975, with a seeming rebuke of plaintiff's counsel for his disregard of the Interrogatories filed by the defendants and for his ignoring of the Court's order to answer. It stated:

"There is an orderly way of proceeding in trial of cases, and I know that your co-counsel, your partner, has received the admonition of the court in very strong and distinct way that, though he was not a member of the bar of this court, he was expected to comply in every respect with the procedures set forth in this case, and he has ignored that.

"He has ignored an order of the court telling him by such and such a day you will file your answer to the interrogatories. He didn't do it. When he did do it they were already out of date. He did not do it in accordance with local rules; he did not do it in accordance with the rules of civil procedure in federal courts, which is just as germane in Cincinnati or Cleveland as it is here."

**10a.** It is significant that nowhere in the plaintiff's letter of March 15 or in the trial court's order of March 26 was there a specific reference to a failure to produce tests relating to the flexible coupling used on the car. The only reference that could under any circumstances point toward the flexible coupling was the request of information "concerning tests, experiments, and studies conducted by Defendants relating to controllability and stability of steering system," all as set forth in "paragraph 10 of * * * Amended Motion."

of roof" and old tests of the steering system, but all such tests were no longer available in the files of the defendants. He, also, answered the other points in the letter of plaintiff's counsel. After the two letters were read, the District Court inquired the identity of the person who had supplied local counsel for the defendants with the material produced. Upon being advised that Ian Ceresney, defendant's New York counsel, was the individual who had furnished the information, the Trial Court issued a citation for contempt against Mr. Ceresney, returnable on March 31, 1976. In the citation itself, there was no indication that the granting of default judgment would be considered and disposed of at this contempt hearing, though it was the statement of counsel for the plaintiff [Mr. Wallace] that the Trial Court remarked at this hearing that, if it found a failure to produce, "Mr. Wallace, you win the case. Do you understand that? You win the case." Later, the Trial Court stated that, while no formal notice of a hearing on such a motion had been entered, it had advised counsel that if it had found a deliberate withholding of information, the Court "was going to consider and very likely would enter default judgment." Counsel for the defendants did not take exceptions to this statement of the Trial Court but emphasized that they had not understood that the Court intended to consider possible default judgment at the time it took up the contempt citation against Mr. Ceresney, particularly since only three days' notice was given on the contempt hearing.

Mr. Ceresney appeared as directed at the contempt hearing on March 31, 1976, and testified. When he completed his testimony, counsel for the plaintiff stated to the Trial Court that since "there [was] no pending motion before this Court for a default judgment, so I orally make a motion, your Honor." At this point, counsel for the defendants requested the opportunity to present another witness. Jurgen Heise, a safety test engineer employed by the defendants, was then sworn and testified. At

the conclusion of his testimony, the District Court proceeded orally to grant judgment under Rule 37(b) on the issue of liability against the defendants. Counsel for the defendants strenuously objected to the oral order for default judgment. He argued that he had not been properly advised that such action would be considered at the contempt hearing and urged that the defendants be given "a full scale rehearing at which time I can present all of the evidence to show exactly what was done." [11] He complained that the District Court, in entering its order, had accepted "as true things which are not in evidence before the Court as being true." He referred to the fact that, in its order, the District Court had mentioned only "flexible coupling and roof tests which [the Court] found that my client wilfully failed to give," and he requested that the Court clarify with a more specific finding the "flexible coupling and roof tests" which the defendants were found to have withheld. All these objections and requests were dismissed by the Court with the statement that counsel could secure answers to his requests by referring to its "findings of fact and conclusions of law," as transcribed by the court reporter.

Within a matter of days after default was ordered and before trial, the defendants moved to reopen the contempt proceedings, to vacate default judgment theretofore entered and to permit a full hearing on the propriety of default judgment. This motion was denied and the cause proceeded to trial thereafter on the sole issue of damages. After a trial on damages, resulting in a verdict for the plaintiff in the sum of $1,050,000, the defendants made another motion, this time for a new trial, arguing that the grant of default judgment was erroneous. They submitted affidavits of Ulrich Seiffert, Chief Test Engineer at Volkswagen, Jurgen Heise, Safety Test Engineer at Volkswagen, and John M. Oakey, Jr., trial counsel for Volkswagen, in support of the motion. The motion was denied, again orally. The defendants, also, moved under Rules 59 and 60 for a new trial. In passing on such motion, the Court first said:

11. *See, Flaks v. Koegel* (2d Cir. 1974) 504 F.2d 702, 712–13.

"Though adhering to its findings, the Court recognizes that the sanction imposed may be considered excessive, though the Court specifically does not so hold. Trial on the merits, however, should be denied only if no other sanction can serve the ends of justice as well."

It then granted a new trial on these terms:

"(a) That defendants will reimburse plaintiff for all costs and counsel fees expended by plaintiff reasonably resulting from defendants' failure to disclose, the amount thereof to be approved by the Court upon proper submission;

"(b) That plaintiff be provided sufficient funds to retain two lawyers accompanied by automotive engineers conversant in German and English, with complete authority and right to search the records of defendants for any material discoverable in this case. Such search, translations and duplication shall have the full cooperation of defendants and shall be at no cost or expense to plaintiff;

"(c) The new trial shall be limited to the question of liability except that, at the option of plaintiff, the question of damages may again be put in issue. In the absence of the exercise of such option by plaintiff, judgment will be entered on a plaintiff's verdict with interest from the date of judgment heretofore entered herein, 6 April 1976.

"(d) That the firm of Hertzfeld & Rubin, P. C., nor any members or associates thereof shall appear as counsel for defendants nor shall they participate in any way in discovery or otherwise as counsel for defendants in this action."

These terms the defendants found unacceptable and chose to appeal from the judgment entered on the verdict in favor of the plaintiff, challenging only the grant of default judgment.

## II

The initial issue in the consideration of this appeal concerns the power of the Trial Court to grant default judgment under Rule 37(b), Fed.R.Civ.P., and assuming it has such power, the scope of judicial review. The power to impose sanctions under Rule 37(b) for failure, after court order in discovery proceedings to produce documents, is discretionary with the Trial Court.[12] It is not, however, a discretion without bounds or limits but one to be exercised discreetly[13] and never "when it has been established that failure to comply has been due to inability, and not to wilfulness, bad faith, or any fault of [the non-complying party]."[14] Particularly is the Court to act cautiously when the sanction imposed is that of default judgment,[15] which is "the most severe in the spectrum of sanctions provided by statute or rule."[16] In that situation the Trial Court's "range of discretion is more narrow" than when the Court is imposing other less severe sanctions.[17] The reason for this narrower range of discretion is that the sanction of a default judgment, though "a rational method of enforcement of the discovery rules," in an appropriate case, represents in effect "an infringement upon a party's right to

---

**12.** *General Dynamics Corp. v. Selb Manufacturing Co.* (8th Cir. 1973) 481 F.2d 1204, 1211, *cert. denied* 414 U.S. 1162, 94 S.Ct. 926, 39 L.Ed.2d 116 (1974).

**13.** In *Trans World Airlines, Inc. v. Hughes* (2d Cir. 1964) 332 F.2d 602, 614, *rev'd on other grounds* 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973), the Court said:

"[I]ts use [i. e., the power to grant default judgment in discovery proceedings] must be tempered by the careful exercise of judicial discretion to assure that its imposition is merited."

*See, also, Securities & Exch. Com'n. v. Research Automation Corp.* (2d Cir. 1975) 521 F.2d 585 at 588.

**14.** *Societe Internationale v. Rogers* (1958) 357 U.S. 197, 212, 78 S.Ct. 1087, 1096, 2 L.Ed.2d 1255.

**15.** *McCargo v. Hedrick* (4th Cir. 1976) 545 F.2d 393, 396.

**16.** *National Hockey League v. Met. Hockey Club* (1967) 427 U.S. 639, 643, 96 S.Ct. 2778, 2780, 49 L.Ed.2d 747.

**17.** *Fox v. Studebaker-Worthington, Inc.* (8th Cir. 1975) 516 F.2d 989, 993.

trial by jury under the seventh amendment"[18] and runs counter to "sound public policy of deciding cases on their merits,"[19] and against depriving a party of his "fair day in court."[20] Because of the importance of these constitutional and policy considerations, a leading text has stated that the exercise of the power should be confined to the "flagrant case"[21] in which it is demonstrated that the failure to produce "materially affect[s] the substantial rights of the adverse party" and is "prejudicial to the presentation of his case."[22] This is so because a default judgment should normally not be imposed so as "to foreclose the merits of controversies as punishment for general misbehavior"[23] save in that rare case where the conduct represents such "flagrant bad faith" and "callous disregard" of the party's obligation under the Rules as to warrant the sanction not simply for the purpose of preventing prejudice to the discovering party but as a necessary deterrent to others.[24] Even in those cases where it may be found that failure to produce results in the discovering party's case being jeopardized or prejudiced, it is the normal rule that the proper sanction "must be no more severe * * * than is necessary to prevent prejudice to the movant."[25] Ac-

18. Note, *Standards for Imposition of Discovery Sanctions*, 27 *Me.L.Rev.* 247, 266 (1975).

19. *Reizakis v. Loy* (4th Cir. 1974) 490 F.2d 1132, 1135.

20. *Gill v. Stolow* (2d Cir. 1957) 240 F.2d 669, 670 (per Clark, C. J.).

To the same effect, *see: Swanner v. United States* (5th Cir. 1969) 406 F.2d 716, 719: *Dunbar v. United States* (5th Cir. 1974) 502 F.2d 506, 509.

21. *See* 8 Wright & Miller, *Federal Practice & Procedure*, § 2284, pp. 767–772:

"This merely emphasizes the fact that Rules 37(b) and 37(d) calls [sic] upon the court to 'make such orders in regard to the failure as are just' and that justice requires that the most drastic sanctions be reserved for flagrant cases.

"Accordingly the courts have administered justice with mercy. They have allowed a party a second opportunity to comply with the discovery rules and orders made under them * * *.

" * * * Yet it seems especially fitting that courts should make the punishment fit the crime and should not impose a drastic sanction that will prevent adjudication of a case on its merits except on the clearest showing that this course is required."

22. *See, Roberson v. Christoferson* (D.N.D.1975) 65 F.R.D. 615, 622, 624; *Guilford National Bank of Greensboro v. Southern Ry. Co.* (4th Cir. 1962) 297 F.2d 921, 923–25; *Wembley, Inc. v. Diplomat Tie Company* (D.Md.1963) 216 F.Supp. 565, 574.

The issue of materiality is always open on appeal. 8 Wright & Miller, *Federal Practice & Procedure*, § 2289, p. 791. In the latter text the editors state: "If sanctions are imposed under Rule 37(b), however, on appeal from the order imposing sanctions the appellate court will consider the propriety of the prior order for discovery."

To the same effect: *Gordon v. Federal Deposit Insurance Corporation* (1970) 138 U.S. App.D.C. 308, 427 F.2d 578, 581; *Von Der Heydt v. Rogers* (1958) 102 U.S.App.D.C. 114, 251 F.2d 17, 18.

23. The rules of discovery "are designed to prevent prejudice due to inadequate trial preparation rather than simply punish obduracy." *Ibid.*, 27 *Me.L.Rev.* at 260.

*See, also, Dorsey v. Academy Moving & Storage, Inc.* (5th Cir. 1970) 423 F.2d 858, 860–1:

"The rule is designed to empower the court to compel production of evidence by the imposition of reasonable sanctions. The court, however, should not go beyond the necessities of the situation to foreclose the merits of controversies as punishment for general misbehavior."

In *Robison v. Transamerica Insurance Co.* (10th Cir. 1966) 368 F.2d 37, 39, the court said:

" * * * The office of 37(d) is to secure compliance with the discovery rules, not to punish erring parties."

*See, also, Linnear v. White* (7th Cir. 1970) 422 F.2d 864, 865.

24. *National Hockey League v. Met. Hockey Club, supra*, 427 U.S. at 643, 96 S.Ct. 2778; *cf., also, Boazman v. Economics Laboratory, Inc.* (5th Cir. 1976) 537 F.2d 210, 212 (involving dismissal under Rule 41(b)):

Dismissal is "such a severe sanction * * * to be used only in extreme circumstances * * *, where 'there is a clear record of delay or contumacious conduct,' * * * and 'where lesser sanctions would not serve the best interests of justice,' * * *."

25. *Diaz v. Southern Drilling Corp.* (5th Cir. 1970) 427 F.2d 1118, 1127, *cert. denied sub nom. Trefina v. United States*, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970). *See, also, Reizakis v. Loy, supra*, at 1135 (involving motion under 41(b) which is analogous to procedure under 37):

cordingly, in determining whether to impose such sanction, the needs of the discovery party must be evaluated as well as the nature of the non-compliance and the Trial Court must consider "how the absence of such evidence [not produced] would impair [the other party's] ability to establish their case" and whether the non-complying party's "conduct [in not producing documents] would deprive [the other party] of a fair trial." [26] And since every exercise of judicial discretion "must find its basis in good reason," [27] the Trial Court, when granting such sanction, "should clearly state its reasons so that meaningful review may be had on appeal." [28]

*In re Professional Hockey Antitrust Litigation* (E.D.Pa.1974) 63 F.R.D. 641, *rev'd.*, 3 Cir., 531 F.2d 1188, *rev'd.* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976), illustrates the procedure to be followed when a Trial Court, in accordance with the foregoing principles, exercises the power to grant the sanction of default judgment. There the Trial Court found that the Interrogatories addressed to the plaintiff and unanswered were "crucial interrogatories" which went to the heart of the discovering party's defense and were thus clearly material; that the plaintiff admitted on a number of occasions that he had available to him the information required for the Interrogatories; that the plaintiff had been given at least five extensions, some made out of time and granted with warnings of possible sanctions, for answering the Interrogatories, always on the representation, never honored, that, if granted, answers would be duly filed; that these delays had forced at least three postponements of a trial date; and that any lesser sanction, such as denial of right in plaintiff to prove the matters not responded to by it, was not a reasonable alternative to default judgment, since the practical effect of denial of right to prove the material by the plaintiff would be to make imperative judgment in favor of the defendants. The Trial Court carefully evaluated "the needs of the discovering party," considered the effect on non-compliance on the "ability [of the defendants] to establish their case" and concluded that no remedy other than default judgment would "prevent prejudice to the movant." These findings, fully detailed in the Trial Court's order, clearly supported the grant of a default judgment "by reason of [plaintiffs'] 'flagrant bad faith' and their counsel's 'callous disregard' of their responsibilities." [29]

■ Recognizing that the power to grant sanctions under Rule 37(b) is discretionary with the Trial Court, it follows that the exercise of such power will only be disturbed on appeal for abuse of discretion. This does not mean, though, that an appellate court should automatically affirm such

"* * * Appellate courts frequently have found abuse of discretion when trial courts failed to apply sanctions less severe than dismissal."

In the Note in 27 *Me.L.Rev.* at 266, the editor states:

"* * * Where any of the more severe sanctions [under Rule 37] is imposed, for example, it is reversible error to neglect to consider the milder sanctions."

**26.** *Fox v. Studebaker-Worthington, Inc., supra,* at 996.

**27.** *American Casualty Co. of Reading, Pa. v. Howard* (4th Cir. 1949) 173 F.2d 924, 927.

**28.** *International Brotherhood of Teamsters v. United States* (1977) 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (decided May 31, 1977). *See, also, Von Der Heydt v. Rogers, supra,* at 17 and 18, where the Court said that the District Court had taken extensive evidence on the "materiality of the records sought, the posses-

sion and control of these records by appellant * * * [but] made no findings other than its order of dismissal which it characterized as containing findings." The Court reversed, saying:

"* * * The burden of showing materiality of the information and ability to produce it rests on the one seeking discovery. At a point the burden of going forward with the evidence may shift to the party asserted to be in possession or control. Absent specific findings to be reviewed in the light of the evidence, we cannot make an adequate assessment of this issue. * * *."

This case was reaffirmed in *Smith v. Schlesinger* (1975) 166 U.S.App.D.C. 205, 509 F.2d 538, the ruling in which case is summarized in the subsequent decision in the same case at 168 U.S.App.D.C. 204, 513 F.2d 462, 467, n. 12.

**29.** 427 U.S. at 643, 96 S.Ct. at 2781.

exercise of discretion. It has been said that an appellate court "would be remiss in [its] duties if [it] chose only to rubber stamp such orders of lower courts."[30] On the contrary, it is obligated "to consider the full record" as well as the reasons assigned by the Trial Court for its judgment, and to reverse the judgment below, if after such review, the appellate court " 'has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' "[31]

### III

The basis of the District Court's decision granting default judgment on liability against the defendants was a finding of "a wilful and deliberate attempt, successful attempt, on the part of the defendant[s] in this case to withhold information properly discoverable." The Court then proceeded to make "clear for the record on appeal," exactly what it found had been "properly discoverable" but improperly withheld by the defendants, on which its decision rested. This specific information was stated to be "evidence having to do with variously caused roof intrusion and flexible couple[ing] tests."[32] At the hearing on the motion to reconsider the defendants emphasized this specific identification of the information found to have been improperly withheld. The Court then broadened at that hearing the finding against the defendants to include "a wilful and deliberate failure to come forward with the names of the cases

that are properly discoverable." The decision below thus rests solely on a finding of a failure to disclose properly discoverable "roof intrusion and flexible couple[ing] tests" and "the names of the cases."

In reaching its conclusion of wrongful withholding of discoverable information, relating particularly to roof intrusion and flexible coupling tests, the Court did not, it must be noted, actually find that there are any additional tests. After observing that the "defendant says that the records don't exist," the Court said:

" * * * That may be. It may be they don't exist, but they haven't convinced me that they don't exist.

"I am not convinced that they don't exist. It was incumbent upon them, it seems to me, particularly under Rule 37, though not under contempt—it was incumbent upon them to convince the Court that the records don't exist."[33]

At the hearing on the motion to reconsider, the Court began the hearing by laying out for the parties why it had found that the defendants had not convinced it that they were not deliberately withholding "discoverable" information:

"THE COURT: Perhaps it would help you by getting right to the heart of it. I don't believe those people—largely, it's a matter of credibility, and I didn't believe what they were telling me about the nonexistence of tests or the methods that they used to determine where they were or what they were, or the non-existence

---

**30.** Waterman, *An Appellate Judge's Approach When Reviewing District Court Sanctions Imposed for the Purpose of Insuring Compliance with Pretrial Orders*, 29 F.R.D. 420, 424–5.

**31.** *Finley v. Parvin/Dohrmann Company, Inc.* (2d Cir. 1975) 520 F.2d 386, 390, quoting from *In re Josephson* (1 Cir. 1954) 218 F.2d 174, 182; *Reizakis v. Loy, supra,* at 1135; *Anderson v. Air West, Inc.* (9th Cir. 1976) 542 F.2d 522, 524; *United States v. Leggett & Platt, Inc.* (6th Cir. 1976) 542 F.2d 655, 658–9 (U. S. appeal pending).

**32.** The Court explained that it was so limiting the finding because "[m]y recollection is that by agreement of counsel in chambers discovery was to be largely limited to these areas."

Such limitation on discovery was confirmed as the understanding of plaintiff's counsel during the deposition of Jurgen Heise. Such counsel said: "Roof and steering, that's really we're all limited to." *See* Note 7.

**33.** The defendants argue that the Court erroneously placed the burden of proof on them. They contend that when they, under oath, had declared that they had produced all the tests in their possession and control, the burden of proving the existence of additional tests rested on the plaintiff. They rely for this position on *Von der Heydt v. Rogers, supra* ; and *Norman v. Young* (10th Cir. 1970) 422 F.2d 470. We are not disposed, however, to base our decision on burden of proof but rather on the established material facts.

of any suits, that Mr. Ceresney filed and the methods used to determine whether or not he disclosed—I simply thought that they were lying to the Court. So it's really not a matter of judging from what they said, what the Court might reasonably conclude because the Court didn't believe what they were saying."

At the end of this same hearing, the Court reiterated the conclusion, stating,

"I had responsible people representing Volkswagen to come into court and, so far as I am concerned, though it is not proof beyond a reasonable doubt, as far as I am concerned they attempted to mislead, they attempted to deceive, they attempted to deceive and have the Court believe this which they wanted the Court to believe without quite seeing it. I would perhaps have had a little more respect for them had they baldly lied; but, they deceptively testified."

In its later order, granting a new trial conditionally, the Court stated that its findings of deliberate withholding resulted from "the indelible impression, * * * forced upon the court by the evasive, contradictory and equivocal testimony heard on 31 March, 1976."

It would appear from all this that the Court was resting its findings against the defendants largely, if not wholly, on its opinion of the credibility and trustworthiness of the testimony given by the representatives of the defendants at the contempt hearing. However, even before it heard that testimony, the Court had apparently reached an unfavorable opinion on the credibility of at least one of the witnesses at such hearing, Ian Ceresney. This was evident in the unusual way in which the Court greeted Ceresney when he presented himself as a witness; it was made even clearer by the Court's critical comments made during interruptions in Ceresney's cross-examination. Thus, when Ceresney presented himself and was sworn at the contempt hearing, the Court at once addressed him, severely admonishing him that he [Ceresney] was "under oath," and adding in language that must be construed as menacing, that "if investigation revealed that it [Ceresney's testimony] is untrue, the Court expects to have you prosecuted for perjury." Hardly had it concluded with this opening threat of possible criminal prosecution, than the Court proceeded to advise the witness, "I will not sit at that trial but I will take the necessary steps to have you prosecuted for perjury." Not content with these two ominous warnings to the witness, the Court, in concluding its opening remarks to the witness, emphasized anew that "if you fail to tell the truth, the whole truth and nothing but the truth, this Court will initiate proper procedures to have you prosecuted for perjury and punished."

There were, however, certain facts and circumstances occurring in the proceedings before the contempt hearing itself began, which appeared to pre-condition critically the Court's attitude toward the defendants and toward the credibility of their witnesses at the contempt hearing and which later entered substantially in the Court's findings and conclusions.

(1) The first of these circumstances was the act of defendants' counsel in signing the answers to the plaintiff's Interrogatories on behalf of the defendants some months before the contempt hearing.[33a] The importance of this act in the Court's findings and its conclusions is demonstrated by the fact that the Court singled this item out as the very first fact which in its opinion justified its findings and the results it reached. The Court began these findings by stating that by this action Ceresney had "abandoned his role as lawyer" and had committed "a gross mistake on the part of the lawyer." As the Court proceeded with its oral findings on March 31, it returned repeatedly to this "most questionable" action by Ceresney, which it found to be "contrary to Federal Rules of Procedure, contrary to the conduct any lawyer ought to permit himself to be

---

**33a.** The answers to the Interrogatories were verified by Wald, another member of Ceresney's firm, but not by Ceresney. The language of the Court apparently assumes that Ceresney had sworn to the answers.

involved in." It declared that whether Ceresney had "a corrupt motive" in engaging in this "gross departure from anything that I [the Court] have ever known of as accepted practice on the part of a lawyer, * * * the result of it is the same no matter what the motive might be." The inevitable result of such action, it proceeded to add, was a situation in which the person who makes oath to the truth or falsity of certain matters has a perfect out,[34] whereby he and his client could escape responsibility for any misstatement and at the same time deceive or mislead the opposing party and the Court. Later, in its opinion, the Court even seems to suggest that such conduct represents the "proper point for me to do justice * * * because by using that tactic, in addition with the strategy of failing to disclose, there is a substantial tendency to obfuscate and confuse, make it difficult for the Court and for the lawyer to know exactly what is going on." And the Court's concluding paragraph in its opinion and findings after the contempt hearing is devoted entirely to this so-called "totally unacceptable conduct of defendants' counsel.[35] It is clear from the Court's language and its findings—from the fact that it began and concluded its opinion and findings with a criticism of this action and that it repeatedly returned to it during its statement of its findings—that this act of defendants' attorney was regarded by the Court as a vital issue, which had a substantial influence on its conclusions.

Yet the Court was in clear error in finding this action of defendants' attorney in signing and verifying on his client's behalf the answers to the interrogatories to be a "gross departure * * * from accepted practice," "contrary to Federal Rules of Procedure," or unethical professional conduct engaged in solely for purposes of deception or obfuscation. Contrary to the view of the District Court, Rule 33, Fed.R. Civ.P. expressly provides that interrogatories directed to a corporate party may be answered "by any officer or agent, who shall furnish such information as is available to the party." This language has been uniformly construed to authorize "answers by an attorney" for the party.[36] The mere fact that defendants' attorney signed and swore to the interrogatories was accordingly no justification for the Trial Court's findings, which reflected unfairly on Ceresney and his trustworthiness and which manifestly was crucial in the Trial Court's ultimate decision to grant default judgment.

In its later oral ruling denying reconsideration, the Court referred to another circumstance unrelated to the testimony at the hearing, but one which seemingly likewise seriously influenced its conclusions. This involved what the Court deemed to be the long failure and default of the defendants in complying with the Amended Motion. Thus, near the end of its ruling on reconsideration, it expressed regret at having been forced to grant default judgment on liability "because I don't think that it is

---

**34.** This criticism could be made in any case where a corporation is a party. Some agent must sign the answers in its behalf and it is unlikely in most cases that any one person in the corporation has participated sufficiently that he can answer an interrogatory, especially one of any complexity, without relying to some extent on information supplied by others in the corporation.

**35.** The Court said:
"* * * I do not understand why local counsel filed interrogatory answers under oath by associate counsel. It is true the Court raised no objection to it because the Court didn't know it; opposing counsel didn't raise any objection to it because opposing counsel apparently didn't care, but local counsel for Volkswagen knew it, and I

would suggest that, if the Court is wrong about its view that that is totally unacceptable, then at some time far removed from today, when you have had an opportunity to look into it further, I would appreciate your setting the Court straight on that, but for purposes of this decision the Court sees no excuse for it; finds it totally unacceptable, cannot understand why reputable lawyers such as New York counsel is presumed to be, would have engaged in this case or in any case."

**36.** 8 Wright & Miller, *Federal Practice & Procedure* § 2172, p. 538; *United States v. 42 Jars More or Less, Etc.* (3d Cir. 1959) 264 F.2d 666, 670; *Fernandes v. United Fruit Company* (D.Md.1970) 50 F.R.D. 82, 85-6.

fair for someone to have a default judgment when there is a meritorious defense, and I think there is a meritorious defense in this case; but I was faced with the situation of almost a year of failure to disclose." It is obvious from this somewhat apologetic explanation of its action that the Court was laboring under the definite impression that for almost a year the defendants had been pursuing a purposeful and deliberate strategy of frustrating discovery under the Motion to Produce. It is true, of course, that the plaintiff filed his Motion to Produce in May, 1975 and the hearing of March 31 was "almost a year" later. But the hearing on March 31 was not on the original Motion to Produce, filed in May, 1975, but on the Amended Motion filed on October 15, 1975. Moreover, the defendants had not been guilty of any blameable "failure to disclose," either as to the original Motion or the Amended Motion. The defendants, though they objected within time to the Motion, always expressed a willingness, as the plaintiff recognized and stated in his Amended Motion to Produce filed October 15, 1975, to attempt to comply when the "areas of inquiry" had been laid out by the plaintiff and the relevancy of the items in the Motion could be determined. And the Court must have considered the defendants' objections to the Motion to have been sound, and their expression of a willingness to comply when the relevancy of the Motion's several requests were resolved, as made in good faith, for on three occasions in October, 1975, it refused preemptorily the plaintiff's Motions to compel compliance by the defendants. Moreover, at the hearing on November 25, 1975, the Court had found expressly that the party responsible for any delay in discovery was the plaintiff and not the defendants, and, as we have seen, had found that the delay was due to the plaintiff's failure to state the defect or defects on which he relied for a claim. In fact, it was not until November 4, 1975, that it could be said what items in the plaintiff's Motion to Produce the defend-

ants were required to produce. There is thus no basis whatsoever for charging the defendants with a year's "failure to disclose."

The Court, again, went outside the testimony at the hearing on March 31 in resting its conclusion on a finding, repeated in its later rulings in increasingly strong terms, that the withholding of discoverable information was "part of trial strategy that New York counsel exercises" in all products liability cases filed against the defendants. Indeed, at the hearing on the motion to reconsider, the Court seemed to find a similarity between the conduct of the defendants in this case and the conduct of the defendants in the "Watergate" cases, declaring that Volkswagen, like the Watergate participants, had "participated in a pattern of stone walling, and they [meaning the defendants] haven't seemed to learn." In its order granting a new trial conditionally, it reaffirmed this finding, saying:

" * * * The Court is confirmed in its belief, having reviewed everything that defendants have filed, that Mr. Ceresney and his firm of Herzfeld & Rubin, P. C. of New York, have adopted non-disclosure as a means of defense in product liability defense claims against their principal client, the defendants herein."

■ This finding was based on the Court's consideration of three other cases against the defendants, cited to it by the plaintiff prior to the contempt hearing.[37] The relevant events surrounding the grant of default judgment in those three cases on which the District Court rested its finding of "pattern of stone walling" a la Watergate, by the defendants' New York counsel, are in dispute between the parties. The differences between the parties were not reflected in proof in the contempt proceedings; they were brought out in the conflicting arguments of counsel, during which they gave their versions of the facts and circumstances giving rise to these defaults, or in the testimony of the defendants' wit-

---

**37.** These cases are *Bollard v. Volkswagen of America, Inc.* (W.D.Mo.1971) 56 F.R.D. 569; *Christian v. Volkswagen of America, Inc.* (D.C. C.1975) C.A. 2215–72; and *Richardson v. Volkswagen* (E.D.Pa.1972) C.A. 70–3260 and # 71–2079.

nesses, based on hazy recollections and, in some instances, hearsay. There was no attempt to incorporate in the record the full records in the Rule 37 proceedings in the three cases or the exact circumstances under which two of the defaults ordered therein were vacated, so that the Court could fairly evaluate the circumstances of the three cases for itself.[38] In one, the plaintiff cited only the reported decision (*Bollard*); in the other two (*Christian* and *Richardson*), the plaintiff had filed certified copies of the orders themselves, supplemented in one case with a hearing before the Court preceding the entry of the order. The circumstances in the three cases were quite different and did not conform to a "pattern." In *Bollard*, the difficulty seems to have arisen out of the filing of several sets of answers, contradictory to each other, to the plaintiff's interrogatories. In *Christian*, the defendants' local counsel refused, though ordered to do so, to produce two sets of test records which counsel contended were privileged as confidential business records the disclosure of which would prejudice the defendants competitively. There was no contention that the defendants or their counsel had "lied" or engaged in any deception; the contention was that the defendants—or, at least, their counsel—had persisted in their claim of privilege after that claim was disallowed by the Court. In the *Richardson* case, the alleged default is not stated, though, as we note later, it was said

that the ground for the Court's action did not rest on any claim of "lying" or deception.

■ When these cases were brought up during his examination, Ceresney attempted to give some explanation of the circumstances surrounding the sanction imposed in each of the three cases, though he was only speaking from recollection without any opportunity to refer to the records or to consult other members of his firm who may have been more intimately concerned with the specific case. In *Christian*, it was his recollection that the default judgment was vacated and a sanction in the form of a fine was imposed upon local counsel and specifically that New York counsel was absolved of blame and relieved of any censure in the case. In *Richardson*, he thought the difficulty concerned the failure of the defendants to produce for deposition two retired employees, whom the defendants claimed they could not produce. The final case was *Bollard*, where default resulted, according to Ceresney's recollection, from failure to verify answers to interrogatories pursuant to an order of the court of which New York counsel were never advised by local counsel. The plaintiff, relying on accounts given him by attorneys for plaintiffs in one or two of these cases, gave in argument a different version of the circumstances of those particular cases. On the record in this case there was no way in which the District Court

38. The general rule is that the Court " 'will not travel outside the record of the case before it in order to take notice of the proceedings in another case, even between the same parties and in the same court, unless the proceedings are put in evidence. * * * ' " *Ellis v. Cates* (4th Cir. 1949) 178 F.2d 791, 793 (quoting from *Morse v. Lewis* (4th Cir. 1932) 54 F.2d 1027, 1029), *cert. denied* 339 U.S. 964, 70 S.Ct. 999, 94 L.Ed. 1373 (1950), *reh. denied* 340 U.S. 857, 71 S.Ct. 69, 95 L.Ed. 627 (1950); *Guam Investment Company v. Central Building, Inc.* (9th Cir. 1961) 288 F.2d 19, 23. The reason for the rule requiring that the record in such cases be made a part of the evidence, if the facts determined in such cases are to be considered in another case is stated in *Guam Investment* thus (quoting from *Paridy v. Caterpillar Tractor Co.* (7th Cir. 1931) 48 F.2d 166, 169);

" 'The reason for the rule above referred to is that the decision of a cause must depend

upon the evidence introduced. If the courts should recognize judicially facts adjudicated in another case, it makes those facts, though unsupported by evidence in the case at hand, conclusive against the opposing party; while if they had been properly introduced they might have been met and overcome by him.' "

It is true that *Ellis* suggests that there may be " ' exceptional cases,' " where " 'the courts, in order to reach a just result, will make use of *established and uncontroverted facts* not formally of record in the pending litigation' " (Italics added). This, the defendants contend, is not such an "exceptional" case and that in any event the facts surrounding the grant of default judgment in the cases cited are not "uncontroverted" but are in sharp dispute. We are inclined to agree with the latter view.

could evaluate these different versions, based as they are in many instances on hearsay. If there had been a full hearing perhaps the exact circumstances under which the three default judgments were granted, and in two cases vacated, could have been inquired into and developed and the contradictions resolved, if the Court were inclined to rest, as it did, its decision at least partially on what it conceived to be the results in these other cases. When the exact circumstances of each case were unclear, as was the situation in connection with the three cited cases, we feel it was inappropriate to use such cases as authority for a finding of deception on the part of New York counsel.

There was another and a more serious objection to the use of these cases for the purposes to which the District Court put them. What the plaintiff was attempting to develop by citing these cases, and what the Court purported to find from them, was a habit or pattern of conduct of "stone walling," to use the Court's term, by New York counsel in discovery proceedings. However, these cases, in their fragmentary and incomplete state—particularly as they were explained by Ceresney—provide a frail reed on which to predicate a finding of pattern or habit of improper professional conduct, and this is especially so in the light of the somewhat strict requirements for the proof of habit or pattern of conduct as established by both the Federal Rules of Evidence and by the authorities in general. It has been repeatedly stated that habit or pattern of conduct is never to be lightly established, and evidence of examples, for purpose of establishing such habit, is to be carefully scrutinized before admission.[39]

The reason for such an attitude toward evidence of habit is the obvious danger of abuse in such evidence resulting from "the confusion of issues, collateral inquiry, prejudice and the like,"[40] or, as one court has phrased it, "the collateral nature of [such] proof, the danger that it may afford a basis for improper inferences, the likelihood that it may cause confusion or operate to unfairly prejudice the party against whom it is directed * * *."[41] It is only when the examples offered to establish such pattern of conduct or habit are "numerous enough to base an inference of systematic conduct"[42] and to establish "one's regular response to a repeated specific situation" or, to use the language of a leading text, where they are "sufficiently regular or the circumstances sufficiently similar to outweigh the danger, if any of prejudice and confusion,"[43] that they are admissible to establish pattern or habit. In determining whether the examples are "numerous enough" and "sufficiently regular," the key criteria are "adequacy of sampling and uniformity of response,"[44] or, as an article cited with approval in the Note to Rule 406, *Federal Rules of Evidence*, puts it, on the "adequacy of sampling" and the "ratio of reactions to situations."[45] These criteria and this method of balancing naturally follow from the definition of habit itself as stated in the *Model Code of Evidence*: "Habit means a course of behavior of a person regularly repeated in like circumstances."[46]

While precise standards for measuring the "extent to which instances must be multiplied and consistency of behavior maintained in order to support an

**39.** *Cf., Utility Control Corporation v. Prince William Construction Co., Inc.* (4th Cir. 1977) 558 F.2d 716, 721.

**40.** McCormick on *Evidence*, § 162 (1964).

**41.** *Nelson v. Brunswick Corporation* (9th Cir. 1974) 503 F.2d 376, 380.

**42.** *Strauss v. Douglas Aircraft Co.* (2d Cir. 1968) 404 F.2d 1152, 1158. *See, also*, 2 Wigmore, *Evidence* § 376 (3d ed. 1940).

**43.** McCormick on *Evidence*, § 162 (1964).

**44.** Advisory Notes, Rule 406, *Federal Rules of Evidence*.

**45.** Lewan, *Rationale of Habit Evidence*, 16 *Syracuse L.Rev.* 39, 49, 51 (1964).

**46.** A.L.I. *Model Code of Evidence* Rule 307; *see, also*, Rule 406, *Federal Rules of Evidence*, which *seems to define habit tersely as "routine practice."

inference of habit and pattern of conduct, cannot be formulated,"[47] it is obvious that no finding is supportable under Rule 406, *Federal Rules of Evidence*, which fails to examine critically the "ratio of reactions to situations."[48] Necessarily, as we have seen, regularity of conduct such as that charged against defendants requires some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place. No such comparison was made or attempted in this case. It was recognized by the parties in their arguments before the District Court that the defendants have been involved in countless lawsuits including claims of products liability. Cornell University has prepared two monographs listing many of these cases and these monographs were in the possession of counsel for the plaintiff. Other than the three cases in which there were initial grants of default judgment (but in two of which it is argued by the defendants the judgments were vacated), counsel for the plaintiff interrogated Ceresney about eight cases in which it was testified no request for default judgment and seemingly no claim of want of attention to discovery requirements on the part of the defendants were made. In addition, the digest for the three years, 1972–5, lists some ten cases against the defendants,[49] in none of which there appears to have been any claim of a strategy of deception in discovery on the part of New York counsel.[50] Counsel for plaintiff, in one of his questions addressed to Ceresney suggested that in recent years there had been at least fifty cases against the defendants involving rollover propensity and at another point it was stated that some two hundred products liability cases had been filed in recent years against the defendants, and defended on their behalf by the same New York counsel as are involved herein. Compared with the large number of cases filed against the defendants, in which no claim of misconduct was apparently made, the mere fact that in three cases, especially in view of the paucity of exact information about them and that default seems to have been vacated in two of them, can hardly be thought sufficient to establish "regularity of response" so automatic as to represent habit or pattern. To make such a finding in this case on the incomplete and confused record we have would be to create what would be a rebuttable presumption in any and all subsequent products liability suits against the defendants. We do not think the proof before the Court was sufficient to impose that serious burden on the defendants and on their counsel, who presumably are reputable and respected members of the bar of the State of New York.

In addition to these circumstances, which were largely outside the actual testimony at the contempt hearing, the District Court singled out certain parts of the testimony of Ceresney and Heise, which it found to be "evasive" and "contradictory" and which justified its finding that the two had "lied" and which supported its finding that the defendants had failed to convince it that additional tests and information did not exist. Thus, in his testimony, Ceresney had used the word "available" in testifying that the defendants had produced all the tests "available" to them. The Court criticized the witness for his use of the term "availa-

---

**47.** Advisory Notes, Rule 406, *Federal Rules of Evidence*.

**48.** Lewan, *supra*.

**49.** On only one of these cases were the defendants' witnesses interrogated at the contempt hearing, *Greiner v. Volkswagenwerk Aktiengeselleschaft* (3d Cir. 1976) 540 F.2d 85. That examination, however, did not relate to this issue.

**50.** *Greiner v. Volkswagenwerk Aktiengeselleschaft* (3d Cir. 1976) 540 F.2d 85; *Sell v. Volkswagen* (6th Cir. 1974) 505 F.2d 953 (defect in suspension system); *Green v. Volkswagen* (6th Cir. 1973) 485 F.2d 430; *Hardy v. Volkswagen* (D.C.Pa.1975) 65 F.R.D. 359; *Volkswagen v. Young* (1974) 272 Md. 201, 321 A.2d 737; *Nacci v. Volkswagen* (Del.Super.1974) 325 A.2d 617; *Seattle-First Nat. Bank v. Volkswagen* (1974) 11 Wash.App. 800, 525 P.2d 286; *Bendorf v. Volkswagen* (1975) 88 N.M. 355, 540 P.2d 835; *Volkswagenwerk Aktiengeselleschaft v. Merritt* (Ark.1976) 531 S.W.2d 938; *McMullen v. Volkswagen* (1976) 274 Or. 83, 545 P.2d 117.

ble." It characterized the term "available" as a word craftily chosen by the witness in order to mislead and deceive the Court and parties. Such a term, according to the Court fell within the category of "evasive type words" or "weasel type words," used as they were by the defendants "knowing full well what the import of them was, that is to say, that if you use a sufficient enough evasions, then you can't be hooked." This is so, the Court adds, "because the word 'available' means anything that a person wants it to mean". It would seem that the Court's conclusion that the defendants had not established—in fact, had not testified unequivocally—that there were no other tests in existence in their files rested to some extent on this use of "available." Thus, it commented during the testimony:

"I've been careful to note that there was no effort here that the Court can accept that they [the additional tests] are not in existence. Everybody has been most careful to use the word 'available'."

It went further and added, as if it intended to hang its decision on the use of this term, that: "That lack of availability will probably prove very costly to Volkswagen."

 It is plain that the Court gave entirely too much significance to the use of the word "available." It is a term in common and accepted use in this context, both in judicial findings and in statutes,[51] and no special significance can be attached to its use. Rule 33, Fed.R.Civ.P. prescribes that, in answering interrogatories, the party "shall furnish such information as is *available to the party*." (Italics added) Rule 34, which deals with the production of documents, directs that, by way of response to a notice thereunder, the producing party shall produce such documents as are in his "possession, custody, or control."[52] The two Rules are equally inclusive in their scope. As the Court in *Commonwealth v. Happnie* (Mass.App.1975) 326 N.E.2d 25, 28–9, said, "availability" and "control" are both "words of art" and are "used to express the same thought." We can find no basis whatsoever for charging the witness with deception simply because he has used a "term of art," which both in common and in legal terms means the same as "control." And this is especially so, since on at least six occasions prior to his use of the term "available," the witness had testified as the Court declared he should have, *i. e.*, that the defendants simply had no reports of such tests other than those produced. Thus, the witness testified earlier without qualification that "we [meaning the defendants] have provided everything that we have in response to a request [for roof intrusion and coupling tests]."[53] Later he testified, in answer to a question about a particular roof test, "[t]here are no such test reports, period. There are no such films, period, other than what we've produced."[54] Again, he said, "[w]e have produced everything we have."[55] The record thus makes it absolutely clear that, whether the word "available" is a verbal salamander or not, and for that reason objectionable, the witness had not sought to use it in order to avoid a positive denial of the existence of additional tests other than those produced under the agreed terms of the Amended Motion and any finding to that effect or the use of such a finding as a basis for a broader finding that the witness had "lied" was clearly erroneous.

---

51. For instance in *General Dynamics Corp. v. Selb Manufacturing Co., supra* — a case cited with approval in *National Hockey League* — the Court repeatedly used the term "available" in exactly the same sense as did Ceresney in this case.

See, also, the Freedom of Information Act, 5 U.S.C. § 552.

52. The words "possession" and "custody" are really superfluous in view of the use of the term "control," which is an all-inclusive word, encompassing both documents in physical "possession" as well as documents which, though in the possession of others, may be deemed under the control of the party. *See Bifferato v. States Marine Corp. of Delaware* (S.D.N.Y.1951) 11 F.R.D. 44, 46.

53. Appendix, p. 481.

54. Appendix, p. 512.

55. Appendix, p. 516.

**514**

The Court cited in its opinion another circumstance justifying the finding that this witness had "attempted to deceive" the Court and had "deceptively testified." [56] This second instance of resort to "evasive" or "weasel" words by Ceresney during his testimony related to the term "allegations." In answering the request of the plaintiff for a list of the "[c]ases in any other jurisdiction involving allegations of defective design of body structure" (later restricted to roof), the witness identified only one other case in which there were "allegations of defective design" of roof structure and he testified that he made such an identification by looking initially to the "allegations" of the complaint. The Court seized on the term "allegations," as a "weasel" and "evasive" term, which it found to have been carefully chosen "to protect the witness from the consequences from his approach to the whole question of discovery." Again, this objection to the witness' language seems unfair. After all, the Amended Motion to Produce itself asked for cases "involving *allegations* of defective design" (Italics added) and we can see nothing improper or evasive in defendants' answering it in the terms in which the request itself was phrased. We accordingly find no basis for attaching some evil purpose to the action of the defendants in using the term "allegations" in their answers in this connection or, for that matter, to the fact that they initially looked to the "allegations" of the complaint in answering the request of the plaintiff. And this is particularly so, since the witness testified that he had also examined such other records in his file as might indicate whether a case involved roof deficiencies and that his examination of the "allegations" of the complaints was only the first step in his examination of those cases where there was additional information in his file.

What we have been discussing related to Ceresney's testimony primarily. The Court, however, regarded with equal disfavor the testimony of defendants' safety engineer Heise, who was the only other witness to testify at the contempt hearing. It finds his testimony "most shakey." It supports this finding by specifying one part of the witness' testimony. In describing the procedure followed by him in his search of the defendants' test records, Heise testified that he went to a "computer-like" list of all tests which had been retained in defendants' files on microfilm and from such a list he ascertained the tests to be reviewed in complying with plaintiff's Motion. The Trial Court, however, found that it was incredible that the tests were not in a computer and it found particularly objectionable that Heise used the term "computer-like" when the tests had not been put on a computer. It expressed disbelief that the defendants "would have gone to the trouble of microfilming these records but they wouldn't have gone to the trouble of putting them on computer." We are unable to follow this reasoning of the Trial Court.

Beyond these animadversions on the phraseology used by Ceresney and Heise in their testimony, the Court made only one other finding in connection with the testimony at the contempt hearing. It found that the defendants had failed to use due diligence to discover tests demanded by the Amended Motion. It based this finding on the fact that Dr. Seiffert, the head of engineering safety and testing for the defendants, had delegated to Heise the responsibility of reviewing, locating and furnishing to Ceresney the test records of the defendants available at their factory and headquarters in Germany, as demanded by the plaintiff. Dr. Seiffert gave a perfectly plausible explanation for his choice of Heise, a trained engineer, to search defendants' records in order to identify and produce the tests which corresponded to the request of the plaintiff. He said:

"Searches and retrievals are conducted by the test engineers themselves and not by others. The engineers are familiar with technical subjects, testing techniques and engineering considerations which are involved in their inquiries and do not leave such search responsibilities

**56.** Appendix, p. 419.

to clerical personnel or to those who are less informed than themselves."

The Trial Court, however, found this was an incredible procedure, and that the defendants should have left the review of the test records to their "archivist," who it stated was "the person who knows how to find and put his finger on what is to be produced." And it concluded that, in resorting to such procedure, the defendants failed "to exercise even the minimum of diligence to come up with the production of the records asked for." [57] The defendants contended, however, that they had no "archivist" in the sense used by the Court. There was, it was conceded, an individual who acted as the custodian of records but this individual lacked any engineering training and was not equipped to determine from their descriptions what tests in the files corresponded with those requested in the Notice. We fail to see in the procedure followed by the defendants any basis for finding that, in using an engineer to make an examination of the test records, the defendants had not used diligence in providing answers to the Amended Motion. It would seem reasonable that an experienced engineer, who was engaged in conducting safety tests, would be better able to identify the tests called for by the Amended Motion, as agreed to, than would a file clerk or even an archivist, without engineering experience. In any event, the use of an engineer to review the files, rather than an "archivist" or file clerk will not support an inference of intended deception on the defendants' part or a finding of a want of due diligence.

It might be noted, too, that there is in the record other information which seems inconsistent with any finding that the defendants had sought to conceal safety tests conducted by them, or a list of products liability cases in which they had been involved. The plaintiff included in the record two reports prepared by the Cornell Aeronautical Laboratory, Inc. of Cornell University in 1968 and 1973, at the request and expense of the defendants. These reports were requested "[t]o determine the effectiveness of safety improvements made through the years in our vehicles" and "[t]o learn where additional improvements could be made in order to improve vehicle crashworthiness." In making its reports Cornell was asked "to report * * * in depth on the behavior of our vehicles in every highway accident it had in its files" and it was understood "that the findings would be made public." The defendants' "only involvement [in the investigation] was in requesting and financing the study." According to Cornell, the investigation represented the only one by an independent investigating agency, recognized for its objectivity, competence and integrity, which had been commissioned and financed by a private automobile manufacturer. All accidents for the years covered were reviewed and analyzed in the reports. No information was withheld. And these reports were available publicly; in fact, the plaintiff's counsel had had such reports for some months before the March 31 hearing.[57a] It would seem inconsistent that a manufacturer, which would finance such an investigation "in depth" by an independent agency of the safety of its cars with the understanding that the results of those investigations would be made public, would be one who would seek to conceal any tests of the safety of its vehicles made by it, or a list of the lawsuits involving roof intrusion or flexible coupling defect claims. Indeed, there would seem little point to any concealment or effort at deception in such regard by the defendants, since any interested party with access to the reports filed

57. Appendix, p. 676.

57a. These reports were instructive on the issues in this case. In the 1968 report, rollovers represented a substantial part of the accidents in which the Volkswagen was involved. In these the "[d]oor openings with subsequent occupant ejection was by far the greatest hazard associated with rollover accidents." The 1968 report accordingly recommended the introduction of seat belts and "a properly designed safety door latch." At the time of the 1973 report, the defendants had made various changes in line with the recommendations of the 1968 report, and the 1973 report showed a substantial reduction in rollover accidents, frequency of door openings and occupant ejection.

with the Secretary of Transportation under the Federal Act and those prepared by Cornell University, could receive the most complete analysis of the safety of the defendants' vehicle. All of these reports were available to the plaintiff and his counsel and would certainly have provided the plaintiff with the most reliable evidence on the safety of the Beetle in a crash or rollover. Even had the defendants failed to produce the plate impact test or a list of cases—and we do not mean to imply that they had not—the plaintiff could not have been prejudiced in the presentation of his claim of want of safety in the vehicle in the light of the ample arsenal of tests and cases readily available to him through information supplied by the Cornell reports and by the Secretary of Transportation. And, while any such failure to produce is not to be approved, it would not be, under those circumstances such a "flagrant" act as to merit the extreme sanction of a default judgment.

### IV

Thus far we have reviewed all the reasons assigned by the District Court for its decision, and indicated why we regard the findings supporting such reasons clearly erroneous. But the error in the decision of the District Court does not exist simply in the reasons the Court assigned therefor. Perhaps more important are the issues the Court never addressed at all in its findings, issues which must be considered by the Court in determining whether to impose the extreme sanction of a default judgment. In *Von der Heydt v. Rogers, supra*, Chief Justice Burger then Circuit Judge, concurring, stated that the first issue which, on appeal from a grant of default judgment under Rule 34, the Court must address is "(a) materiality of the information

sought."[58] Unfortunately, the District Court never focused in its decision on this issue. Nor did it make findings on how the plaintiff might be prejudiced in the presentation of his case by the failure to produce any evidence found by the Court to have been in the "possession, custody or control" of the defendants,[59] specifically "how the absence of such evidence would impair [his] ability [of the plaintiff] to establish [his] case" or how the non-production "would deprive [the plaintiff] of a fair trial * *."[60] Nor did it purport to consider in its initial decision on March 31 any "less severe sanction" than default judgment.[61] Yet all of these were critical issues which the District Court was required to address in determining whether to grant default judgment.

There can be little argument, it seems to us, that the flexible coupling tests were immaterial to plaintiff's case and failed to meet the first criterion required under Judge (now Chief Justice) Burger's rule as stated in *Von der Heydt v. Rogers, supra*. Plaintiff's claim, as to the flexible coupling, related not to design but to installation. This he made plain in his response to the defendants' motion to extend discovery. He stated that it was his position "that said steering mechanism [meaning the flexible coupling] was improperly assembled and not hooked up." In developing this claim, the plaintiff relied on his expert witness, Harris, who in late September or October, 1975, had "discovered" this defect. In his deposition, Harris testified that, based on his examination, the flexible coupling was "not hooked up at the time * * * [of] the accident." He said the flexible coupling was not defectively designed or dangerous if properly "hooked up." In fact, the flexible coupling was the same in use in most cars[62] and the witness said he had never heard of any case in which there had been

**58.** 251 F.2d at 19.

**59.** *See, Von der Heydt v. Rogers, supra*, at 19.

**60.** *See, Fox v. Studebaker-Worthington, Inc., supra*, at 996.

**61.** *See, Reizakis v. Loy, supra*, at 1135; Note, 27 *Me.L.Rev., supra*, at 266.

**62.** Since the flexible coupling was in general use on most cars, its design was well known and readily accessible. In other words, the design was not in the exclusive knowledge of the defendants.

any claim of defect in it. He explained that, from his examination, he was of opinion that three of the bolts which joined it to the steering mechanism were never installed, and it was these three bolts which resulted in the coupling being "not hooked up" at the time of the accident. No design tests would cast any light on whether some employee of the defendants had neglected to install all the bolts required in the flexible coupling when the car was assembled. Whether such bolts were installed or not turned on the conflicting opinions of the expert witnesses for the two sides, as well as the credibility of the testimony of the mechanics who had repaired the car after its earlier accident in September preceding,[63] and not by the records of any safety tests, conducted in the 1930's, in a period not covered by the Amended Motion.

Similarly, the roof intrusion tests are immaterial on the record as it existed at the time of the hearing on March 31. The logic of this was stated by the Court itself at the reconsideration hearing when it inquired of counsel for the plaintiff why such tests would not "have been, under the medical proof in this case, wholly irregular [immaterial?] to the questions involving the injury to your client because the medical evidence shows, according to the examining physicians in the emergency room at MCV, that there was no damage inflicted, no bodily damage inflicted on Mr. Wilson from the intrusion of the roof." [64] It added that under that assumption, the "testimony was strangely deficient in failing to point out that he had a blow on his head * * *."

Counsel for the plaintiff's only answer to this inquiry of the Court was that he "did not think to ask him that question." A month after default judgment had been entered and trial on damages had been concluded, plaintiff's counsel sought to meet this point, not by any testimony of the examining doctor or even by any testimony of the plaintiff, but by an affidavit of his expert witness Block, who was neither a licensed engineer nor a physician but qualified as "a member of the Human Factors Society for many years in the 1960's." Block stated that when he inspected the car more than two years after the accident, he had observed a headprint in the sunvisor on the driver's side of the car. On the basis of that fact, he said that the plaintiff's injury "was, in my opinion, caused when the roof structure on the driver's side (to which the sunvisor was attached) crushed inward and downward upon the frontal upper portion of Wilson's skull during the rollover." In explanation of his opinion, he stated that, "[T]he fact that John Wilson may not have sustained any significant injury to the frontal area of the skull is irrelevant to the issue of the mechanism of his injury." [65] Whether plausible or not, this explanation, made as it was a month after entry of default judgment, could hardly be regarded as justifying the Court at the contempt hearing in disregarding the materiality argument advanced by the defendants.

It must be observed, too, that the defendants offered what seemed fairly reasonable explanations for the absence of any roof intrusion or flexible coupling tests [which were the only two items of withheld infor-

---

**63.** In a proffer of proof at the end of the trial, the defendants stated they were prepared to prove by the mechanic who repaired the vehicle after the September accident that the flexible coupling was properly "hooked up" at that time. If such testimony were actually produced, it could support the opinion of the defendants' experts that the missing bolts from the flexible coupling had been removed from the mechanism after the accident. In any event, it could be considered a refutation of the claim made by the plaintiff's experts that the flexible coupling was not hooked up when the vehicle left the defendants' factory in 1972, some three years earlier. It must, also, be remembered that the plaintiff himself had not testified to

any malfunctioning of the steering at the time of the accident.

**64.** The plaintiff himself testified at his deposition:

"Q. Did you have any head injury?
"A. Nothing, no."

**65.** As to whether the affiant could qualify as an expert witness capable of giving such an opinion, *see, Gilbert v. Gulf Oil Corporation* (4th Cir. 1949) 175 F.2d 705, 709. Rule 702, *Federal Rules of Evidence*, merely codifies the rule stated in *Gilbert*. *See, also, Horton v. W. T. Grant Co.* (4th Cir. 1976) 537 F.2d 1215, 1218.

mation specified in the Court's initial order for default judgment] other than those produced. Both Ceresney and Heise conceded in their testimony that there may have been flexible coupling tests conducted while the Volkswagen Beetle was being developed and prepared for marketing in the 1930's but, if so, those tests had long since been lost or abandoned and were no longer "available." The Amended Motion only called for tests on the Beetle between 1966 and 1972 and the witnesses said that no flexible coupling tests were conducted during this period. The witnesses proceeded to explain that the Beetle had been on the market since the 1930's, over 50,000,000 had been sold, there had never been a claim of any defect in design or operation of the flexible coupling until this case and the flexible coupling was substantially the same as that used on other cars. For this reason, the defendants asserted there would have been no occasion for them, after the introduction of the model, to test later for safety a mechanism that had been used for decades without any subsequent claim of defect or danger. In substantial part, this testimony had been confirmed previously in the testimony by deposition of the plaintiff's own expert witnesses. Despite all this, the findings of the District Court, as set forth in its oral opinion of March 31 contain no statement of reasons for finding this explanation unconvincing or incredible, other than the purely peripheral matters to which we have already referred.

■ It is true the Court did suggest during the testimony of Ceresney, two reasons why it may have found the explanation with reference to the flexible coupling tests untrustworthy. Both reasons dealt with the testimony that any tests conducted in the 1930's had been lost, discarded or destroyed. The Court said, first, that it was not in character for a German organization ever to destroy or discard anything. In proof of this, it said:

"Don't you know that the Germans have the marching orders from the Franco-Prussian War and are preserved in the German Reich? They haven't destroyed anything."

The second reason was that it was, the Court stated, the custom of automobile manufacturers to retain permanently all records of tests. When the defendants' counsel expressed some doubt about such a custom or practice, the Court replied, "I told you what the custom was." Neither of these reasons assigned by the Court for disbelieving the defendants' explanations is persuasive. The mere fact that the German War Office may have retained for many years certain military records does not support a finding that all German commercial organizations preserve permanently all their records any more than do any other commercial organizations. Nor can a custom be established on the part of automobile manufacturers, without proof, merely on a judicial *ipse dixit*.[66] Moreover, it was entirely irrelevant to the whole inquiry whether the defendants had preserved tests conducted in the 1930's or not. The Amended Motion did not call for the production of any such tests; it called only for tests between 1966 and 1972. In the absence of any more findings than we have here, the holding that this explanation of the unavailability of any flexible coupling tests conducted between 1966 and 1972 was unconvincing is clearly erroneous.

The finding with reference to roof intrusion tests is equally as obscure as that of flexible coupling. The real controversy here seems to center, as we have already indicated, on the existence of the records of

---

**66.** See *McJunkin Corporation v. North Carolina Natural Gas Corp.* (4th Cir. 1961) 300 F.2d 794, 800, *cert. denied* 371 U.S. 830, 83 S.Ct. 43, 9 L.Ed.2d 68 (1962); *Julius Kayser & Co. v. Textron, Incorporated* (4th Cir. 1956) 228 F.2d 783–90; *United States, etc. v. Guy H. James Construction Co.* (M.D.Tenn.1972) 390 F.Supp. 1193, 1209, *aff'd.* 6 Cir., 489 F.2d 756 (Table). In *James*, the Court said:

" * * * Existence of usage or custom can only be proved by numerous instances of actual practices, and not by opinion of a witness. A person seeking to establish custom or usage has the burden of proving it by evidence so clear, uncontradictory and distinct as to leave no doubt as to its nature and character."

an impact plate test. The defendants had produced records of three other tests relating to roof safety.[67] Included in them was the specific roof intrusion test required by the Secretary under § 1392, 15 U.S.C., the Traffic and Motor Vehicle Safety Act. There was, however, evidence that the defendants' Chief Safety Engineer had conducted an impact plate test and had published an account of such a test conducted on a Beetle to determine roof intrusion strength. The records of such a test were not produced by the defendants. The defendants, however, offered an explanation for the non-production of this impact plate-type test. The witnesses for the defendants testified, either in person or by affidavit, that this test was developed as an alternative to the sled test, produced by the engineers for Mercedes Benz, another German manufacturer. Both the defendants and Mercedes Benz were attempting to develop an appropriate test for roof strength or, as it is called in this case, for roof intrusion strength, which they hoped to induce the Secretary under the Act to adopt for cars qualifying under that Act. These witnesses explained that, when the Secretary chose the sled test perfected by Mercedes Benz, rather than the impact plate test, as developed by the defendants, for the approved roof strength test under the Act, the defendants had no further use for the records of its alternative test, prepared solely as a substitute for the sled test, saw no reason to preserve them, and discarded them. This is an explanation which is not implausible.

It seems wholly unlikely that the defendants would have concealed this impact plate test because it was unfavorable to them— which it would seem must have been the Court's conclusion. After all, the defendants were attempting to induce the Secretary to adopt this test as his standard roof strength test. It is unreasonable to assume that the defendants would be pressing for the adoption of a safety test which would be unfavorable to the safety of their vehicle. To the contrary, it is fair to assume that the defendants considered the impact plate test more favorable to the Beetle on roof strength characteristics than the sled test, which was adopted by the Secretary and which admittedly was produced by the defendants. Under these circumstances, we think again the District Court should have given its reasons for dismissing as unconvincing the defendants' explanation, an explanation which on its face is quite reasonable, for the absence of any record of the impact plate test. Without providing any such reasons, the conclusions of the Court that the defendants' evidence of unavailability of this test is not convincing is unsupportable.

Though requested by the defendants, the Court did not indicate what facts, other than those already discussed, made it conclude that other flexible coupling tests or roof intrusion tests existed. We have carefully examined every circumstance set forth in the Court's findings to justify its conclusion that Ceresney and Heise had "lied" or why their testimony was lacking in conviction. None of the circumstances identified by the Court for its conclusions will sustain the result reached by the Court. Some of the reasons assigned by the Court are, as we have seen, based on an erroneous construction of the Rules themselves. Others would create a presumption of wrong-doing without a supportable predicate. The remaining reasons rely on the Court's personal nuances of language. A denial to a party of a right to a trial on the merits cannot be justified on any such clearly erroneous reasons.[68]

In its ruling on the defendants' response to the request for "other cases," both the plaintiff and the Court seemed to have

---

**67.** The tests produced were the inverted drop test which is "where you turn the car upside down and bring it in the air and drop it [for a distance of six feet] on the concrete;" a sled-type rollover test which is "where a vehicle was put sideways on a sled, run down a track. The sled stops fast and the vehicle rolls off sideways * * *;" and the crush test which is "where a plate is pressed against the top of the car, instant, and then slowly crushes down for a certain length of time * * *."

**68.** *See, McCargo v. Hedrick, supra.*

overlooked the fact that the whole inquiry, by the Court's own statement and the plaintiff's admission,[69] was limited to cases involving "allegations" of "roof intrusion and flexible coupling" defect. It seems admitted that there were none involving an allegation of "flexible coupling" defect. In the exchanges between the witness Ceresney and plaintiff's counsel, the parties ranged over a number of cases. It was obvious from the exchange that plaintiff's counsel considered any "roll-over" case as involving a case with "allegations" of "roof intrusion," whereas Ceresney construed the Amended Motion, as restricted by the Court, to apply only to a rollover case in which there was an allegation that the injury suffered from the rollover resulted from a roof intrusion defect or lack of roof support. The Court apparently adopted the construction of plaintiff's counsel. We, however, are of opinion that the construction adopted by Ceresney was not unreasonable and certainly did not justify the grant of default judgment. Under the circumstances, the Court could have clarified his oral order and given the defendants a reasonable time within which to comply. It may be said that this would have given the plaintiff little time to review any additional cases which might have been identified before trial which was only about two weeks away. However, this would have been the fault of the plaintiff who delayed raising this point until on the eve of trial.

But even if this claim of materiality and of proper production be disregarded, the question remains why a "lesser sanction" did not represent a reasonable alternative to the "extreme" sanction of default judgment. The plaintiff had three sets of roof strength tests;[70] he had all the roof strength tests required by the Secretary of the Traffic and Motor Vehicle Safety Act. There was thus an extensive record of tests on roof strength of the Beetle. The impact plate test, which was, as we indicated; the only test really in issue, could at best have been only an additional or cumulative test. Was it not reasonable, if the Court felt that the defendants had failed deliberately to produce the records of such test, to have entered an order that it would be taken as a fact that this particular test (i. e., the impact plate test) had proved unfavorable to the Beetle? That is the most that the plaintiff could have hoped to gain from the test, assuming that it was unfavorable to the defendants' claim of safety. But such a result, unlike the application of a similar sanction in *National Hockey*, would not have been decisive on liability. It would only have been a fact to consider along with the results of the other tests and tests required by the Secretary. The Court, however, again unlike the Court in *National Hockey*, never gave any thought to the possibility of an alternative sanction "lesser" in effect than one granting default judgment, until months after the grant of default judgment and trial on damages.

The same situation prevailed in connection with the "list of cases." If the Court felt that the defendants had not adequately examined into the records of the two hundred-odd cases filed against the defendants to spot the specific cases, if any, which included "allegations of" roof intrusion injury, it could have required the defendants to produce their files on these cases and to be examined about them. This may have forced some delay in trial but the Court had already changed the trial date earlier because of the plaintiff's delay in complying with his discovery obligations. Fairness would seem to demand that the same consideration be extended the defendants.

Finally it would appear that the Court itself developed doubts about the propriety of its action in granting as precipitably as it did default judgment on liability. In its order granting conditionally a new trial, it conceded:

> "Though adhering to its findings, the Court recognizes that the sanction imposed may be considered excessive, though the Court specifically does not so hold. Trial on the merits, however, should be denied only if no other sanction can serve the ends of justice as well. * * *

---

**69.** *See* Note 32.

**70.** See Note 67.

"In order to afford a trial on the merits, the Court will grant the defendants' motion for a new trial but only on terms * * *."

The difficulty with the conditions attached to the grant of a new trial is that, if the plaintiff were not entitled to a default judgment on liability, the defendants were entitled of right to a trial on all issues, both of liability and of damages, and it would not do to deny it such a right.[71]

We are of the opinion the District Court erred in granting default judgment on liability in favor of the plaintiff. Judgment of default judgment on liability is accordingly reversed and retrial ordered.

---

**71.** There are other objections to the conditions. One stated by the defendants has the ring of reason. It was:

"Paragraph (c) of the Court's Order contains an inherent error of law in that it requires defendants to accept the damages award rendered in the damages trial, and gives plaintiff a unilateral option of a full new trial. This is particularly unfair in a case where one of the major allegations relates to the subject of 'crashworthiness' or 'enhanced injury,' wherein, assuming such an action can be maintained under Virginia law, the defendants would not be responsible for all the damages sustained by plaintiff but, at best, only such injuries as could be proved beyond speculation and conjecture to have been 'enhanced' as a result of allegedly negligent design. By granting plaintiff a unilateral option to maintain the judgment on damages, which obviously bears no relationship to any proof of an 'enhanced' injury, the defendants are deprived of their rights to a full trial by jury and of due process of law."