RAMBUS, INC., Plaintiff,

v.

INFINEON TECHNOLOGIES AG, Infineon Technologies North America Corp., and Infineon Technologies Holding North America, Inc., Defendants.

No. CIV. A. 3:00CV524.

United States District Court,
E.D. Virginia,
Richmond Division.

June 12, 2001.

Michael W. Smith, Craig T. Merritt, Christian & Barton, L.L.P., Richmond, VA, David E. Monahan, John Allcock, Esquire, Gray Cary Ware & Freidenrich LLP, San Diego, CA, for Plaintiff.

Brian C. Riopelle, Robert M. Tyler, McGuire Woods, LLP, Richmond, VA, John M. Desmarais, Kirkland & Ellis, New York City, for Defendants.

## MEMORANDUM OPINION

PAYNE, District Judge.

This Memorandum Opinion further explicates the basis for the decision made on April 19, 2001 granting the Motion to Exclude Dr. Huber's March 13, 2001 Second Supplemental Expert Report filed by the Defendants and thereby precluding Rambus, Inc. ("Rambus") from presenting testimony disclosed for the first time in an untimely expert report respecting patent infringement.

## STATEMENT OF FACTS

Rambus filed a complaint on August 8, 2000, alleging infringement of two of its patents against Infineon Technologies AG, Infineon Technologies North America Corp. and Infineon Technologies Holding North America, Corp. (collectively referred to as "Infineon"). On October 20, 2000, Rambus filed an Amended Complaint adding charges of infringement as to two additional patents. Infineon, in turn, filed an amended answer and counterclaims against Rambus alleging fraud, breach of contract, violations of the antitrust laws, violations of the Racketeer Influenced Corrupt Organizations Act and sought a declaratory judgment that the patents in suit are invalid and that Infineon's products do not infringe those patents.

The Scheduling Order entered on October 3, 2000 provided that "Local Rule 26 shall govern the disclosure and discovery of experts and their reports." Local Rule 26(D), in turn, provides that "[c]ounsel are encouraged to agree upon the sequence and timing of the expert disclosures required by Fed.R.Civ.P. 26(a)(2). All such agreements must be in the form of a consent order entered by the Court." See also Fed.R.Civ.P. 26(a)(2)(C) (expert disclosures "shall be made at the times and in the sequence directed by the court.") Pretrial Schedule A to the Scheduling Order states, "[u]nless the court orders otherwise for good cause shown, expert witnesses and reports not disclosed as required by Federal Rule of Civil Procedure 26(a)(2) and (3) and the deadlines established herein shall not be allowed to testify or be admitted into evidence, as the case may be."

The parties in this case were unable to agree to a discovery schedule as they were permitted to do by the Local Rules and by the Scheduling Order and, therefore, they sought the assistance of the Court during a telephone conference on November 28, 2000. Having considered the competing considerations outlined by the parties in

that conference, the Court set a schedule for expert reports that required: (1) expert reports on all issues as to which a party bore the burden of proof to be exchanged on December 20, 2000; (2) Infineon to submit a supplemental expert report on invalidity on January 8, 2001; and (3) rebuttal expert reports to be exchanged on January 19, 2001. Also, the parties submitted a consent order, entered by the Court on December 28, 2000, which provided that fact discovery closed on January 26, 2001 and that expert discovery closed on February 9, 2001.[1]

Both parties complied with the court-ordered schedule by submitting their expert reports on the designated dates (December 20th, January 8th and January 19th). However, both parties submitted additional expert reports beyond the dates scheduled by the Court. Rambus' patent expert, Dr. William Huber, issued a Supplemental Report on February 15, 2001 and a Second Supplemental Report on March 13, 2001. Infineon's expert, Mr. Joseph McAlexander, issued a Supplemental Report on March 7, 2001. Neither party sought relief from the scheduling orders before serving these supplemental reports.

 The subject of this motion is Dr. Huber's expert report filed on March 13, 2001 on behalf of Rambus and the proposed testimony based thereupon.[2] Infineon seeks to exclude Dr. Huber's testimony because the March 13th report contains entirely new theories on the issues of infringement and patent validity. Infineon's complaints are that, for the very first time, in the March 13th report: (1) Dr. Huber provides literal infringement theories based upon Infineon's patent claim constructions which is a reversal of his earlier infringement theories; (2) Dr. Huber presents a doctrine of equivalents [3] infringement analysis; and (3) Dr. Huber provides entirely new validity theories based on prior art which had been previously addressed in Dr. Huber's earlier reports.

Rambus justifies this late report as a necessary response to the Court's claim construction of the patents. Thus, a brief review of proceedings respecting claim construction is helpful to understanding the argument made by Rambus. As required by *Markman v. Westview Instrs., Inc.*, 52 F.3d 967 (Fed.Cir.1995), *aff'd* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), a patent claim construction hearing was held on February 26–28, 2001 during which the Court, *inter alia*, heard evidence from Dr. Huber and Mr. McAlexander about the interpretation of certain disputed terms that appear in the claims of the patents in suit. The claim construction opinion was issued on March 15, 2001, finding, in large part, that the construction pressed by Infineon was the construction of the disputed terms that was required by the intrinsic evidence (which is the preferred source of claim interpretation). *See Rambus v. Infineon Technologies AG*, Civ-

1. The Stipulated Order also required patent claim construction briefs and summary judgment motions to be filed by February 1, 2001.

2. No objection has been raised respecting Dr. Huber's report of February 15, 2001 or Mr. McAlexander's report of March 7, 2001.

3. "The doctrine of equivalents prevents a copyist from evading patent claims with insubstantial changes." *Valmont Indus. Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1042 (Fed.Cir.1993) (citing *Charles Greiner & Co. v. Mari–Med Mfg.*, 962 F.2d 1031, 1036 (Fed.Cir. 1992)). Thus, "[a]n equivalent under the doctrine of equivalents results from an insubstantial change which, from the perspective of one of ordinary skill in the art, adds nothing of significance to the claimed invention. An equivalent under the doctrine of equivalents, though not literally meeting the claims, still infringes the patent." *Id.*

il Action No. 3:2000cv524 (E.D.Va. March 15, 2001). Rambus acknowledges that Dr. Huber's report of March 13th presents new literal infringement and invalidity analyses based on the claim constructions offered by Infineon (analyses which Rambus had not conducted until this report). As to the doctrine of equivalents, Rambus contends that the March 13th report is a more fullsome treatment of previous references to that topic contained in prior timely reports of Dr. Huber.

## DISCUSSION

Federal Rule of Civil Procedure 26, which is incorporated into Local Rule 26, provides that expert reports "shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor ..." Fed.R.Civ.P. 26(a)(2)(B). Infineon contends that Rambus violated Rule 26 and the Court's pretrial orders by failing to disclose these infringement and invalidity opinions within the Court-ordered schedule for discovery of experts. Thus, it seeks to exclude Dr. Huber's testimony on the newly disclosed theories.

## I. Sanctions Under Rule 37

Rule 37(c) specifies sanctions for the failure to make disclosures required by Rule 26:

A party that *without substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1) *shall not, unless such failure is harmless, be permitted to use as evidence at a trial*, at a hearing, or on a motion any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under subparagraphs (A), (B), and (C) of subdivision (b)(2) of this rule and may include informing the jury of the failure to make the disclosure.

Fed.R.Civ.P. 37(c)(1) (emphasis added). The first sentence of Rule 37(c)(1) provides an automatic preclusion sanction against the noncomplying party which prevents that party from offering the non-disclosed evidence at trial if that failure to disclose was not substantially justified, unless the failure was harmless. The second sentence of the rule is somewhat inconsistent with the automatic preclusion text in the first sentence, because that sentence permits, either in addition to, or in lieu of, the preclusion sanction, imposition of "other appropriate sanctions," including attorneys fees, an order indicating that the matters are taken to be established, an order prohibiting that party from introducing the matter into evidence, an order striking pleadings, dismissing the action or an order entering judgment by default. *See* Fed.R.Civ.P. 37(b)(2)(A), (B) & (C) and (c)(1). Notwithstanding the second sentence, Rule 37(c)(1) has been described as "a 'self-executing sanction for failure to make a disclosure required by Rule 26(a),' designed to provide a 'strong inducement for disclosure.'" *Carney v. KMart Corp.*, 176 F.R.D. 227, 229 (S.D.W.Va.1997) (citing Fed.R.Civ.P. 37 (Advisory Committee Notes)).[4]

---

**4.** The Advisory Committee Notes to Rule 37 explains:

The revision provides a self-executing sanction for failure to make a disclosure required by Rule 26(a), without need for a motion under subdivision (a)(2)(A).

\* \* \* \* \* \*

Limiting the automatic sanction to violations "without substantial justification," coupled with the exception for violations

"The strong inducement for disclosure" results from the interplay between Rule 26 and Rule 37. Rule 26 was amended in 1993 with the explicit purpose to put an end to abusive discovery practices which often resulted in protracted discovery and soaring litigation costs. The Advisory Committee Notes Rule 26 explain:

> paragraph [ (a)(2) ] imposes an additional duty to disclose information regarding expert testimony sufficiently in advance of trial that opposing parties have a reasonable opportunity to prepare an effective cross examination and perhaps arrange for expert testimony from other witnesses.

> \*　　\*　　\*　　\*　　\*　　\*

> Paragraph (2)(B) requires that persons retained or specially employed to provide expert testimony, ... must prepare a detailed and complete written report, stating the testimony the witness is expected to present during direct examination, together with the reasons therefor. The information disclosed under the former rule in answering interrogatories about the 'substance' of expert testimony was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert and often was even of little help in preparing for a deposition of the witness. *Revised Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed.*

Fed.R.Civ.P. 26 (1993 Advisory Committee Notes) (emphasis added).

### 1. The Test for Imposing Sanctions Under Rule 37

■ The parties disagree as to the appropriate test to be applied in considering the propriety of sanctions under Rule 37. Relying on the plain language of the rule, Infineon contends that it is only necessary to find that: (1) Rambus failed to disclose the report without substantial justification and (2) Infineon was harmed by this failure. Rambus, however, argues that the Fourth Circuit has adopted a four-factor test for sanctions under Rule 37:(1) whether the non-complying party acted in bad faith; (2) the amount of prejudice caused by noncompliance; (3) the need for deterrence of this kind of noncompliance; and (4) whether less drastic sanctions would be appropriate. *See Wilson v. Volkswagen of Am., Inc.,* 561 F.2d 494, 503–505 (4th Cir. 1977), *cert. denied* 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978); *Anderson v. Foundation for Adv., Educ. and Empl. of American Indians,* 155 F.3d 500, 504 (4th Cir.1998) (applying the *Wilson* test).

Infineon contends that Rule 37(c) contains its own test for sanctions and that, therefore, the test propounded by *Wilson* and its progeny is inapplicable.[5] Further-

---

that are "harmless," is needed to avoid unduly harsh penalties in a variety of situations ....

Fed.R.Civ.P. 37 (Advisory Committee Notes of 1993).

The rule, however, is not really self-executing. "Instead, the party seeking to invoke the preclusion sanction must first prove that the opposing party violated Rule 26(a) and 26(e)(1) by failing to disclose the evidence in question earlier in the proceedings." 7 *Moore's Federal Practice,* § 37.60[2][a] (Matthew Bender 3d ed.). Even when this is accomplished, the preclusion sanction does not apply automatically because the non-complying party will still have an opportunity to show that the failure was justified or that it was harmless. *Id.*

**5.** Infineon cites to an unpublished Fourth Circuit decision which affirms the decision of a district court refusing to exclude expert testimony. *See Proctor v. Tsao,* 1998 WL 708689 (4th Cir.1998). In *Proctor,* the Court of Appeals did not mention a standard at all, but did use language similar to Infineon's proposed test by finding that "any failure on the

more, Infineon adds that both *Wilson* and *Anderson* discuss the applicability of sanctions under Rule 37(b)(2) (sanctions for failing to comply with the court's orders), not Rule 37(c)(1) which is at issue here. Although, the language of *Anderson* is not so circumscribed,[6] *Anderson* was concerned, not with failure to make disclosures, but with failure to answer interrogatories and produce documents, as well as failure to abide by orders entered respecting that type of discovery.

The approach suggested by Infineon is faithful to the text of the first sentence of Rule 37(c)(1). But, it does not take adequate account of the second sentence. Conversely, by requiring a bad faith analysis, the approach taken by *Wilson* and *Anderson* is somewhat at odds with the 1993 change to Rule 37(c)(1). However, the Fourth Circuit recently set forth an appropriate analytical framework for applying Rule 37(c)(1) in the unpublished decision in *Burlington Insurance Co. v. Shipp*, 215 F.3d 1317 (table), 2000 WL 620307 (4th Cir.2000).[7] There, Judge Niemeyer addressed whether the district court erred in excluding the testimony of a non-expert witness who was not listed in the pre-trial order, but was sought to be added to the witness list six days before trial. Explaining first that Fed.R.Civ.P. 26(a)(3)(A) requires that a party disclose to the other party the names, addresses and telephone number of all witnesses to be called at trial, the Court then looked to Rule 37(c)(1) for the consequences of failing to comply with this requirement, expostulating that:

A party who without substantial justification fails to disclose information in compliance with Rule 26(a) "shall not, unless such failure is harmless, be permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." Fed. R.Civ.P. 37(c)(1). "The determination of *whether a Rule 26(a) violation is [substantially] justified or harmless* is entrusted to the broad *discretion* of the district court." *Mid–America Tablewares, Inc. v. Mogi Trading Co.,* 100 F.3d 1353, 1363 (7th Cir.1996); *see Adalman v. Baker, Watts & Co.,* 807 F.2d 359, 369 (4th Cir.1986).

*Id.* at *4 (emphasis added). Combining factors used by other courts of appeals addressing Rule 37(c), *Burlington Insurance* articulated a five factor test to guide the exercise of disclosure used by the district court:

In exercising that discretion, a district court is guided by the following factors: (1) the surprise to the party against whom the witness was to have testified; (2) the ability of the party to cure that surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the explanation for the party's failure to name the witness before trial; and (5) the importance of the testimony. *Adalman,* 807 F.2d at 369; *see also Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.,* 170 F.3d 985, 993 (10th Cir.1999) (listing similar factors to be considered by trial court under Rule 37(c)(1)); *United States v. $9,041,598.68,* 163 F.3d 238, 252 (5th Cir.1998) (same).

part of plaintiff's expert to comply with Rule 26 was harmless error." *Id.* at *4.

**6.** *See Anderson,* 155 F.3d at 504 ("The Fourth Circuit has developed a four-part test for a district court to use when determining what sanctions to impose under Rule 37").

**7.** Unpublished opinions are not precedent in the Fourth Circuit but they are useful analytical tools.

*Id.* at *4.[8]

Although not argued by Rambus to support its approach, there is Fourth Circuit authority suggesting that the unjustified failure to disclose also must be accompanied by bad faith or callous disregard of the discovery rules before preclusion is available as a sanction. *See Tritchler v. Consolidation Coal Co.*, 91 F.3d 134, 1996 WL 379706, *2 (4th Cir.1996) (unpublished opinion) ("Generally, preclusion is considered a drastic remedy, and it is not imposed unless the party's conduct is in bad faith or callous disregard of the discovery rules"). Additionally, a leading commentator has observed that "many judges are reluctant to exclude evidence that is important to the merits of the case without a showing of substantial and largely irremedial prejudice, as well as bad faith, willfulness or substantial fault." 7 *Moore's Federal Practice*, § 37.60[2][b] (collecting cases). *Tritchler* cites no authority for its interpretation of Rule 37(c)(1) and the plain language of the rule contains no requirement for bad faith or callous disregard of the discovery rules. In fact, the rule is rather harsh in that it automatically imposes the preclusion sanction unless the noncomplying party can show that there is substantial justification for the failure to make the disclosure and that the failure to disclose was harmless.

As unpublished decisions, *Tritchler* and *Burlington Insurance* are not binding authority. Notwithstanding *Tritchler*, the approach of *Burlington Insurance*, a more recent decision, more closely tracks the plain language of the rule; is consonant with its purpose; and is harmonious with the approaches to Rule 37(c)(1) taken in other circuits. Additionally, the facts in *Burlington Insurance* are more proximate to the factual posture of this case. Perhaps, most important, however, is that *Burlington Insurance* provides an approach that reconciles the apparent inconsistency between the first and second sentences of Rule 37(c)(1) by informing the district court's broad discretion. Therefore, the five factor test of *Burlington Insurance*, which does not contain a bad-faith requirement, appears to provide the appropriate construct in which to assess the issue here presented.[9]

## A. The Surprise To the Party Against Whom the Witness Was To Have Testified

■ Infineon rightly contends that it is surprised by the contents of the March 13th report. Rambus served the March 13th report more than a month after the close of expert discovery. At that time, the trial was scheduled to begin in a week.[10] In that report, Dr. Huber made

---

8. In *Woodworker's Supply*, 170 F.3d at 993, the Tenth Circuit relied upon the following four factors: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness. *United States v. $9, 041,598.68*, 163 F.3d at 251 adopts the following factors: (1) the importance of the witness's testimony; (2) the prejudice to the opposing party of allowing the witness to testify; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation, if any, for the party's failure to identify the witness.

9. Though bad faith or wilfulness is not a requirement under the test used here, this factor would be met as well. For the reasons set forth in the remainder of the opinion, it is clear that Rambus acted in callous disregard of both the strictures of Rule 26 and the Court's scheduling orders. *See Tritchler*, 1996 WL 379706 at *2 (indicating that callous disregard of the discovery rules may be basis for Rule 37(c) sanctions).

10. The trial was scheduled to begin on March 20, 2001. Due to other discovery motions not relevant here, the trial was continued several times and ultimately began on April 23, 2001.

substantial changes to the substance of, and the bases for, his opinions on the issues of literal infringement and the validity of the patents. Additionally, the March 13th report presents an opinion about infringement under the doctrine of equivalents, a view that had not been the subject of any of Dr. Huber's previous reports and a topic that had not even been mentioned previously except in the most cursory of references.

Indeed, until March 13th, Rambus had relied exclusively on theories of literal infringement contained in Dr. Huber's previous expert reports. Those theories mirrored the theories disclosed in answers to interrogatories that called upon Rambus to articulate its claims of infringement. Infineon, in turn, relied on those disclosures in the preparation of its defense—selecting what witnesses to depose, deciding what fact discovery to conduct and preparing its own expert evidence. As an example of Rambus' reliance solely on literal infringement, Infineon cites Rambus' response to an interrogatory wherein Rambus stated that it "presently contends that the asserted claims are literally infringed by the Infineon memory devices . . . ."

Rambus' only response to that undeniable set of circumstances is that it "reserved its right" to amend its interrogatory answers and reports to include new theories of infringement based upon the Court's claim construction and to include infringement under the doctrine of equivalents. Without doubt, there are numerous statements in interrogatory answers and expert reports to the effect that Rambus attempted to reserve its right to alter its infringement analysis to include a doctrine of equivalents theory or to adjust to the Court's claim construction ruling.[11] Dr.

Huber's reports state "[i]n the event that different claim constructions are adopted by the Court, or the Court rules the literal infringement does not apply, I reserve the right to offer an opinion on infringement under the doctrine of equivalents." Also, the December 20, 2000 and February 15, 2001 reports state:

> Because Infineon SDRAM and SGRAM devices literally infringe all of the asserted claims, it is clear that they also infringe those claims under the doctrine of equivalents. If we were to apply the classical "function-way-result" test, the accused Infineon devices clearly perform substantially the same function in substantially the same way to obtain substantially the same result.

At the close of the discovery period, however, these passing references constituted the only mention of the doctrine of equivalents. Not until the March 13th report did Dr. Huber add any substantial content to that conclusory language. In that report, he added several charts purporting to apply the "function-way-result" equivalents test to some of the asserted claims.

The unilateral assertion of a "reservation of rights," on which Rambus fastens its justification for Dr. Huber's belated report, simply is of no effect. Indeed, Rule 26(a)(2), its local counterpart, the Scheduling Order and Pretrial Schedule A, the verbal order issued on November 28, 2000, and the Consent Order entered on December 28, 2000 are all directed, *inter alia,* at controlling the timing of expert disclosures, precisely to the purpose that the unilateral action of a party cannot alter the schedule on which the substantive Rule 26(a)(2) disclosures are to be made. Each

11. For example, in its response to the previously mentioned interrogatory, Rambus stated that it "reserves the right to claim infringement under the doctrine of equivalents as to any accused product."

of those control mechanisms, in one way or another, inform the parties that expert opinions not timely disclosed will not be permitted in evidence at trial.

Infineon was entitled to rely on these control mechanisms, all of which were in effect in this action. As Infineon urges, it had no reason to expect a doctrine of equivalents opinion by Dr. Huber after the close of expert discovery. Nor does the cursory "reservation of rights" language satisfy the requirements of Rule 26(a)(2), which calls for the complete explanation of theories being offered by experts and the reasons, bases and data therefor. Thus, nothing in the supposed, but ineffectual, "reservation of rights" put Infineon on notice of the doctrine of equivalence analysis first posited by Dr. Huber on March 13th. This change in course is certainly surprising.

As to the new invalidity and literal infringement analyses, it is undisputed that the March 13th report was the first time that any of these theories or analyses were introduced into the case. Thus, the contents of the March 13th report are a surprise to Infineon.

## B. The Ability Of The Party To Cure That Surprise

Infineon argues that it cannot overcome the surprise and prejudice occasioned by the untimely report. Although Dr. Huber was deposed two days after the March 13th report, Infineon asserts that this does not cure the failure to disclose because a proper response to the new theories requires more than simple expert witness cross-examination. According to Infineon, a sufficient response would require the reopening of fact discovery because it would need: (1) to gather evidence on the subject of interchangeability, which requires testimony from persons in the industry and others; (2) to develop evidence about the

scope of the prior art for the invalidity defense—evidence that is different than the prior art gathered to defend a claim of literal infringement; and (3) the opportunity to examine the unprecedentedly lengthy and complex prosecution history of the Rambus patents in order to present a defense of prosecution history estoppel.

As to the doctrine of equivalents, there is no effective opportunity to cure the prejudice or surprise unless there is a continuance so that Infineon can prepare to defend against an entirely new theory of infringement, including gathering information on prosecution history estoppel and interchangeability. Given the lengthy history and broad "family tree" of the patents in suit, that endeavor would be quite time-consuming. Thus, a continuance would need to be of such a long duration that the delay itself would constitute another form of prejudice to both parties.

The belated articulation of the new theories of literal infringement also cause prejudice to Infineon, in varying degrees. Taking the disputed terms addressed in the *Markman* hearing *seriatim*, Infineon has demonstrated that the new construction and application of the terms "first external clock signal" and "second external clock signal" is harmful because it will need to conduct extensive testing of Infineon's products in comparison with Dr. Huber's opinions. Rambus has not refuted that additional testing would be required. Therefore, the delay in Rambus' submission of the March 13th report, even if substantially justified, is not harmless as respects those issues.

As to the new opinions about how the terms "bus," "read request" and "write request" apply in the rubric of literal infringement, Infineon charges that the March 13th report is structured around an attempt to rewrite the Court's *Markman* opinion. Rather than analyzing infringe-

ment under the constructions explicitly laid out in that opinion, Infineon argues that Rambus is attempting to finesse and rework the constructions therein set forth. To the extent that Dr. Huber has attempted to circumvent the *Markman* opinion, that effort, whether timely or not, can be of no avail. Claim construction is a matter of law, left solely to the province of the court. Neither Rambus nor Dr. Huber can make an end run around that.

Aside from the asserted attempt to escape the implications of the *Markman* opinion, a circumstance that the Court can deal with if it arises at trial, Infineon has not demonstrated that it is prejudiced by the new analysis of the terms "bus," "read request," "write request," and "transaction request" and even admits that there is no prejudice as to the term "block size." At most, Infineon has merely contended that it will need to revamp its cross-examination of Dr. Huber. This burden, given the overall scope of the trial, does not appear to be overly onerous. This is particularly true given that Infineon has had the opportunity to depose Dr. Huber on the subjects.

Lastly, as to the new invalidity analysis, Infineon has shown that its trial preparation will be affected by the need to have a substantial response from its infringement and invalidity expert, Mr. McAlexander. Although the task certainly can be expected to be a great one, it can be conducted by an expert whose presence will not be required during much of the trial. Thus, despite added legal fees and expert witness costs that will be incurred by Infineon, it does not appear that the presentation of a cogent defense will be prejudiced as to those topics. If it turns out that the task is insurmountable, the issue can be revisited. For now, it is sufficient to charge Rambus with any added fees and

expenses occasioned by the belated disclosure on this topic.

## C. The Extent To Which Allowing The Testimony Would Disrupt The Trial

A continuance, of course, would significantly disrupt the scheduled trial, at which numerous witnesses, from all parts of the United States and from overseas, will appear. Even if additional discovery were not necessary, the introduction of new theories of infringement, whether literal (to the extent addressed above) or under the doctrine of equivalents, would substantially change the character of the case and render obsolete much of the parties' trial preparation. It would also interject an additional, and considerably complex, legal theory to an already complicated case. At the time of the hearing on this motion the pretrial conference (which lasted two days) had been completed; more than a thousand trial exhibits had been marked, objected to and objections thereto resolved; deposition trial testimony had been initially designated and initially counter-designated; and the jury was scheduled to be selected the following day. Thus, the disruption to trial, whether a continuance is granted or not, would be great.

## D. The Explanation For The Party's Failure To Name The Witness Before Trial

### 1. The *Markman* Opinion

The principal excuse offered by Rambus for the delay in presenting all of these new theories of liability is that "a court's Markman ruling changes the landscape of [every patent] case," and, therefore, Rambus "was *required* to alter its infringement analysis when the Court adopted a different claim construction." Rambus Opp. at 2 and 3 (emphasis in original). There are two fundamental difficulties with this "ex-

planation": it mischaracterizes the sequence of events, as Rambus conceded at oral argument, and it ignores the facts about how the issue of claim construction was presented in this case.

The *Markman* hearing was conducted on February 26–28, 2001. At the end of a hearing on another matter on March 14th, the Court indicated that it would issue the *Markman* opinion the following day, and, in an effort to assist the parties in preparing for the final pretrial conference (which was to begin the next day) and for trial, the Court informed counsel that the claims would be construed using, with minor revisions, the definitions proposed by Infineon. The *Markman* opinion was issued the next day, March 15th. Two days before the issuance of that opinion and one day before the oral announcement of its essence, Rambus disclosed Dr. Huber's March 13th report. At oral argument on this motion, Rambus prudently abandoned the assertion that the report was a direct response to the *Markman* opinion and explained that a comment by the Court in settlement discussions had given Rambus reason to believe that its claim construction position was in jeopardy.[12]

Additionally, at the *Markman* hearing in late February, it likely was obvious from the rather unpersuasive nature of Dr. Huber's testimony, and from the questions and the skepticism expressed by the Court during the hearing, that the claim constructions being pressed by Rambus were an unlikely interpretation of the intrinsic evidence. That, of course, would have alerted an observant attorney to the prospect that Rambus' claim construction might not be viable; and, indeed, counsel for Rambus acknowledged as much at oral argument on this motion.

The language of Dr. Huber's March 13th report reveals the basis for its creation— *the possibility that the Court may adopt some of Infineon's proposed constructions*—not the Court's claim construction opinion:

> At [the Markman] hearing, Infineon presented definition of certain disputed claim terms that differed from the definitions presented by Rambus. While the Court's ruling on the definitions is not yet available, it is possible that some or all of Infineon's definitions could be adopted by the Court ... In this report, all of the Infineon-proposed definitions of disputed claim terms are presumed to apply except the definition of "integrated circuit device" as applied to Claim 26 of the '804 patent.

Using that predicate, Rambus asserts that the March 13th report, with its new theories of literal infringement, the doctrine of equivalents infringement and patent invalidity, were required by Rule 26(e)(1).[13] However, on the facts presented here, Rambus cannot rely on Rule 26(e)(1) to justify the late tender of Dr.

---

12. The standard Scheduling Order requires the parties to discuss settlement with a judicial officer. In this case, the Court presided over discussions with both parties and counsel and, thereafter, with the consent of both parties, explored several proposals in *ex parte* conversations with each side. During the *ex parte* portion of the settlement process, the Court, (as is done in all cases), pointed out the perceived areas of weakness of the party with whom the *ex parte* conference was held. Apparently, something that the Court said in one of the settlement sessions with Rambus' counsel at some time after the *Markman* hearing led counsel for Rambus to believe that the position of Rambus on claim construction may not have been persuasive.

13. This rule requires a party to "supplement or correct the disclosure ... to include information thereafter acquired ... if the party learns that in some material respect the information disclosed is incomplete or incorrect ..." Fed.R.Civ.P. 26(e)(1).

Huber's report. Instead, it was the apprehension that the Court might reject Rambus' claim construction arguments that prompted Dr. Huber's belated expert report. That does not constitute substantial justification for amending the report on the facts of this case. The parties knew the schedules established by order of the Court. At least as early as December 2000, it was obvious that the *Markman* hearing would be conducted after the conclusion of expert discovery. It would seem to be an equally obvious proposition that the expert reports, therefore, needed to respond to the possibility that the claim construction opinion might reject the interpretations advanced by Rambus. Rambus chose not to acknowledge that possibility. Conversely, Rambus has known since at least February 1st (if not earlier), that Infineon proposed claim constructions that were quite different than those being proffered by Rambus. It, thus, certainly was possible that the construction tendered by Infineon might be found to be correct. Under the circumstances, it was incumbent upon Rambus to have Dr. Huber examine Infineon's claim construction and offer alternative opinions on infringement and validity.

The decision in *Loral Fairchild Corp. v. Victor Co. of Japan Ltd.*, 911 F.Supp. 76 (E.D.N.Y.1996) is instructive here. In that case, the patent holder repeatedly stated that it relied exclusively on a theory of liability in which claims 7 and 8 of its patent were limited to methods of operation of claim 1 in that patent. *See id.* at 78. The parties, therefore, focused their discovery on the structure contained in claim 1. *Id.* at 79. The plaintiff "Loral apparently foresaw no [sic] need to urge alternative theories based on differences in the words of claims 1 and 7." *Id.* When the court interpreted claim 1 more narrowly than Loral advocated, Loral changed its theory of liability on claims 7 and 8. *Id.*

Judge Rader of the Federal Circuit, sitting by designation, prevented Loral from pursuing this alternative theory because it would unduly prejudice Sony. He stated:

> At the outset of this litigation, Loral could have proceeded under alternative theories.... Its experts may have [ ] opined [as to different theories], and its discovery responses could have fairly represented this position. Loral chose not to follow this path.

*Id.* at 80. The approach outlined in *Loral* is certainly not unusual. Indeed, in many cases, the expert reports posit alternate opinions predicated on the views of the opposition expert.

Rambus is correct in its argument that the facts of *Loral* are for more egregious than its conduct here. The reasoning of *Loral,* however, remains unaffected. Rambus deliberately chose to ignore any other possible claim construction and, when the *Markman* hearing did not embrace its construction, it belatedly revised its expert reports to cover the assertedly "new" construction.

### 2. Infineon's Alleged Delay In Providing Claim Constructions

Rambus next offers the fallback argument that it was not able to give an expert report based on Infineon's construction because "Infineon's approach to providing a claim construction analysis was one of delay and obfuscation." Rambus Opp. at 7. To support this justification for the tardy March 13th report, Rambus relies on Infineon's answer to its Interrogatory No. 5. In that interrogatory, Rambus asked:

> For each and every Infineon product or device accused of infringement in this action, identify on a claim chart ... each limitation of each claim of the patent in suit that Infineon contends is not met by each such product or device, the basis

for Infineon's contention that the limitation is not met literally or under the doctrine of equivalents, an all portions of the patent-in-suit and related prosecution file and/or prior references that Infineon asserts support its contention.

Infineon at first did not fully respond to that interrogatory because Rambus had not identified any specific products alleged to be infringed, nor had Rambus offered its claim construction for the patents-in-suit. On December 4, 2000, Infineon responded:

> Non-infringement of patent claims depends, in part, on the interpretation of claim language in the asserted claims. Claim construction is a question of law for the court. In this case, the Court has not yet construed any claims of the patents in suit. Accordingly, Infineon reserves its rights to supplement or amend its responses to this interrogatory once the Court rules on the interpretation of the claim language in the asserted claims of the patents-in-suit.

The remainder of the answer goes on to list, in considerable detail, the reasons why the accused Infineon's products do not infringe each of the patents in suit. Although the answer does not specifically set forth a construction for each claim, it certainly provides a learned reader a rather substantial indication of Infineon's views on the subject.

Furthermore, it is not clear that this interrogatory actually asked for a proposed claim instruction. Instead, it merely asked Infineon to explain why its products do not infringe the asserted patents. In any event, if Rambus was dissatisfied with the response and believed that it needed more detail as to Infineon's proposed claim constructions, it was incumbent upon Rambus to meet and confer with Infineon. Then, if the answer remained insufficient, Rambus should have

moved to compel the information it thought to be lacking. Rambus pursued neither option; therefore, it cannot be heard now to complain about the inadequacy of Infineon's answer or to use that alleged deficiency as the justification for Dr. Huber's late report.

Rambus also contends that the first time it knew of Infineon's proposed claim constructions was on February 1, 2001 when it received Infineon's opening *Markman* brief. That contention, however, ignores the information set forth in Mr. McAlexander's January 19th report. The four terms for which Rambus now offers alternate infringement theories using Infineon's claim construction ("bus," "request," "block size" and first and second external clock signal), were all discussed in that report. Rambus never complained that Mr. McAlexander's report was not compliant with Fed.R.Civ.P. 26 as to completeness and thoroughness. Moreover, Dr. Huber's rebuttal report on January 19, 2001 even addressed Infineon's view of some of the disputed claim terms by disagreeing the Mr. McAlexander's view of "bus," "read request," and "transaction request".

In addition, the stipulated order entered on December 28, 2000 required the parties to exchange a list of disputed claims terms on January 29, 2001. Two days later, the parties exchanged their opening *Markman* briefs. Even if, for some reason, Rambus did not fully understand Infineon's proposed constructions until it reviewed Infineon's opening *Markman* brief, it clearly had that information as of February 1, 2001. It then had eight days until the close of expert discovery to file an amended report to address the claim construction posited in that brief. Additionally, it could have approached the Court to request relief from the Scheduling Order and to seek additional time in which to have Dr. Huber

opine on infringement and validity under Infineon's claim construction. Rambus chose to ignore these options. Not until the eve of trial does it appear that Rambus even entertained the notion that alternate theories of infringement or validity may be necessary should the Court find its proposed constructions not to be grounded in the intrinsic evidence. *See Nike Inc. v. Wolverine World Wide, Inc.,* 43 F.3d 644, 648 (Fed.Cir.1994) (affirming the preclusion of a doctrine of equivalents claim when the plaintiff reserved its right to bring a doctrine of equivalents claim, but waited until after the close of discovery to begin testing for infringement under the doctrine of equivalents).

*Loral Fairchild* likewise teaches that a party acts at its peril when it eschews having an expert opine on the questions of infringement and validity using the opponent's claim construction. It is true, as Rambus argues, that a party is not required to forecast every possible permutation of claim interpretation upon which a court might settle; but, it is certainly not expecting too much to have a party assess the opposing expert's opinions and posit alternate opinions on the assumption that the opposing party's claim construction might be persuasive to the court. That course is followed in a wide range of other types of litigation and there is nothing in patent litigation that would warrant a different approach in patent cases.

Indeed, were the course outlined in *Loral Fairchild* not followed, expert disclosure and discovery would become quite protracted and burdensome in patent cases. Of course, if a *Markman* opinion produces a claim construction that is significantly divergent from the views presented for consideration, the parties may seek added time to have their experts consider the construction. In that circumstance, it is almost inconceivable that extra time would be denied. But, that is not what happened here. On this record, Rambus deliberately ran a foreseeable risk—one articulated in both *Nike* and *Loral Fairchild*—in failing to have its expert posit alternate opinions assuming Infineon's views of claim interpretation to be correct.[14]

### 3. The Fact That Both Parties Reserved The Right To Supplement Their Reports

As explained previously, Rambus' "reservation of rights" is utterly ineffective to alter the time schedule set forth in the Federal Rules of Civil Procedure, the Local Rules and the Court's orders because a party's unilateral act cannot change the scope of those official control mechanisms. As it turns out, Infineon's equally ineffectual "reservation of rights" is not at issue, but, if it were, Infineon's efforts would be likewise rebuffed. *See Carney,* 176 F.R.D. at 230 ("the Court will not excuse noncompliance with Rule 26 by one party for the reason that the other party may not have fully complied.") (quoting *Smith v. State Farm Fire & Cas. Ins. Co.,* 164 F.R.D. 49, 54 (S.D.W.Va.1995)).

### E. The Importance Of The Testimony

The last factor, the importance of Dr. Huber's testimony, must be viewed both from the perspective of both parties. There is no doubt that it is important for Rambus to be able to offer a doctrine of equivalents infringement theory, as well as

---

**14.** Rambus impliedly argues that it acted no differently than did Infineon because Infineon offered no alternative claim construction based on Rambus' view of the disputed terms.

That may be true, but Infineon's conduct is not at issue here. In any event, the same rule would have applied to Infineon.

the new literal infringement and validity testimony. It is equally important that Infineon be in a position to meet that testimony.

Rambus, however, created this situation by turning a blind eye to the possibility that the claim construction announced by the Court could be other than that pressed by Rambus. Given the weight of the previous factors, the importance of the testimony to Rambus cannot change the analysis. That is particularly so where the testimony is highly prejudicial to the ability of Infineon to mount a defense which it has prepared based on entirely different theories. As the *Loral Fairchild* decision warns, "a trial court in the wake of articulating a legal meaning of claim terms must carefully police the parties' new theories of liability or defenses to prevent prejudice after the close of discovery." 911 F.Supp. at 79.

In sum, and applying the *Burlington Insurance* test and the provisions of Rule 37(c)(1), preclusion of testimony on certain topics in Dr. Huber's belated March 13th report is an appropriate sanction. Specifically, the late interjection of the doctrine of equivalents infringement analysis is not substantially justified within the meaning of Rule 37(c) and the late presentation of that theory on the eve of trial is anything but harmless. For those reasons, Dr. Huber will be precluded from testifying as to this new theory of infringement.[15] Likewise, Dr. Huber's new literal infringement analysis concerning "first external clock signal" and "second external clock signal" also lacks substantial justification and presents irremedial prejudice to Infineon because of the extensive testing that would be required to respond to the analysis.

Accordingly, Dr. Huber's testimony on that topic is foreclosed as well.

The showing of prejudice, however, is not as strong as to the new invalidity analysis or as to the literal infringement analysis respecting the terms "bus," "read request," "write request" and "transaction request." Infineon's response to the literal infringement analysis on those four terms requires an adjustment of the cross-examination strategy, but Infineon can accomplish this task and present an adequate defense at trial, *albeit* at considerable expense. Thus, even though substantial justification is lacking, the harm can be cured by requiring Rambus to pay for the added expense. Therefore, because Rambus' tardiness caused the need for adjustment, Rambus shall be required to pay the legal fees and expert costs incurred by Infineon in responding to this portion of the report.

Lastly, although Infineon insisted that it would be extremely difficult to respond to the new invalidity analysis, (which is equally lacking in justification), Mr. McAlexander will be given the opportunity to respond to that analysis. To this end, a ruling on preclusion of this testimony is reserved until the completion of Mr. McAlexander's responsive report. However, Rambus will be required to pay the legal fees and expert costs incurred by Infineon and Mr. McAlexander in responding to the new invalidity analysis.

## II. Preclusion Under Rule 16(f)

Infineon has also sought preclusion of testimony based on the topics in Dr. Huber's March 13th report under Fed. R.Civ.P. Rule 16(f). This rule states:

> [i]f a party or party's attorney fails to obey a scheduling or pretrial order . . .

---

**15.** Infineon has also challenged the sufficiency of Rambus' doctrine of equivalents analysis. Given the disposition of this issue under Fed.R.Civ.P. 16(f) and 37(c), this argument need not be addressed.

the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just, and among others any of the orders provided in Rule 37(b)(2)(B), (C), (D).

Fed.R.Civ.P. 16(f).

■ "As a general matter, a trial court has 'wide latitude' in imposing sanctions on parties who fail to comply with pretrial orders and procedural rules." *Hatton v. Spencer*, 204 B.R. 477, 485 (E.D.Va.1997) (quoting *Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*, 808 F.2d 902, 903 (1st Cir.1987)). *See Potomac Elec. Power Co. v. Electric Motor Supply, Inc.*, 190 F.R.D. 372, 377 (D.Md.1999) ("It is well settled that the court has considerable discretion in determining whether to permit an expert, who is designated after the scheduling order deadline for doing so, to testify").

■ The factors to be considered under this rule are substantially the same as those considered under Rule 37(c): (1) the reason for failing to name the witness [or failing to complete expert witness reports]; (2) the importance of the testimony; (3) potential prejudice in allowing the testimony; and (4) the availability of a continuance to cure such prejudice. *Id.* (relying upon *Geiserman v. MacDonald*, 893 F.2d 787, 791 (5th Cir.1990)). *See also* 3 *Moore's Federal Practice*, § 16.92[6][b] (citing the four-factor *Geiserman* test for determining whether testimony or evidence should be precluded). For the reasons set forth under the Rule 37(c) analysis in Section II above, Rambus' proffered reasons for not disclosing the theories in accordance with the pretrial orders are not justified on these facts, the prejudice to Infineon is great and irremedial to the same extent as previously discussed, and a continuance is not a viable option given the history of this case. As concluded above, the importance of the testimony to Ram-

bus' case does not outweigh the three other factors, therefore, if measured by Rule 16(f), Dr. Huber's testimony would be excluded to the same extent as discussed above under Rule 37(c) and, to the extent allowed, the same sanctions would apply.

## CONCLUSION

For the foregoing reasons, the sanctions of preclusion and reimbursement of fees and expenses are fully warranted under Rule 37(c) and Rule 16(f). Hence, Rambus may not present testimony as to infringement under the doctrine of equivalents; Rambus may not present testimony based on Dr. Huber's March 13th report as to literal infringement respecting the terms "first external clock signal" and "second external clock signal"; Rambus may present testimony on Dr. Huber's March 13th report as to as to literal infringement respecting the terms "block size," "bus," "read request," "write request" and "transaction request,"; and Rambus may present testimony on the invalidity analysis contained in that report provided that Mr. McAlexander has been able to adequately prepare a response. Additionally, Rambus shall pay Infineon's Legal fees incurred in adjusting their cross-examination of Dr. Huber and shall pay the legal fees and expert costs incurred in employing Mr. McAlexander to respond to the new matters contained in the March 13th report.

The Clerk is directed to send a copy of this Memorandum Opinion to all Counsel of Record.

It is so ORDERED.